BENJAMIN VAUGHN, DC Bar #999347
E-mail: Benjamin.vaughn@cfpb.gov
Phone: (202) 435-7964
GABRIEL HOPKINS, NY Bar #5242300
Email: Gabriel.hopkins@cfpb.gov
Phone: (202) 435-7842
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-7722

LEANNE E. HARTMANN, CA Bar #264787 - Local Counsel
E-mail: Leanne.hartmann@cfpb.gov
301 Howard St., Suite 1200
San Francisco, CA 94105
Phone: (415) 844-9787
Fax: (415) 844-9788

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Bureau of Consumer Financial Protection, ) | Case No.: 2:19−cv−07722 ODW (JEMx) |
| Plaintiff, ) | |
| vs. ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION. |
| Certified Forensic Loan Auditors, LLC ) (California); Certified Forensic Loan ) Auditors, LLC (Texas); Andrew Lehman; ) and Michael Carrigan, ) | |
| Defendants. ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................... 3

   I.   Defendants' mortgage-assistance relief operations........................................ 3

     A.   Defendants' marketing of the Audits and Litigation Documents.................. 4

     B.   Lehman is the president and founder of CFLA and has managerial responsibility for the company. ................................................................ 5

     C.   From 2014 through 2019, Carrigan was CFLA's exclusive "auditor," and assembled the Audits based on CFLA templates. ................................. 6

   II.   CFLA's Audits incorrectly claim that the right to foreclose on the underlying mortgage has been "lost." ........................................................................... 7

     A.   CFLA's Audits incorrectly claim that the securitization of the consumer's mortgage eliminates the right to foreclose. .......................................... 8

     B.   CFLA's Audits incorrectly claim that assignment of the mortgage through MERS eliminates the right to foreclose. ............................................. 9

     C.   CFLA's Audits incorrectly claim that violating securitization trust documents eliminates the right to foreclose. ...................................................10

   III.   CFLA's Audits purported to identify the trust holding the consumer's mortgage, but frequently did not.......................................................................10

   IV.   CFLA's Audits were not effective at defeating foreclosure actions or obtaining loan modifications. ....................................................................................11

     A.   Courts have consistently rejected CFLA's Audits and Defendants did not identify any courts that relied on them. ..............................................12

     B.   Many consumers have complained that CFLA's products did not work as promised. ...............................................................................................14

ARGUMENT....................................................................................................16

   I.   The Bureau is likely to succeed on the merits. .................................................16

     A.   Defendants are subject to the CFPA and Regulation O................................16

     B.   Defendants violate Regulation O by collecting advance fees. ......................17

     C.   Defendants' misrepresentations are deceptive under the CFPA and prohibited representations under Regulation O. ....................................................18

     D.   Defendants' marketing and sale of the Audits and Litigation Documents is abusive under the CFPA. .......................................................................22

E.    Andrew Lehman is individually liable under the CFPA. .............................23

II.   The balance of equities weighs in the Bureau's favor.....................................24

CONCLUSION ...................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baker v. CitiMortgage, Inc.*, No. 17CV02271SRNKMM, 2018 WL 1838060 (D. Minn. Apr. 18, 2018)................................................................................. 9

*Barrionuevo v. Chase Bank, N.A.*, No. C-12-0572 EMC, 2013 WL 4103606 (N.D. Cal. Aug. 12, 2013) ...........................................................................13

*Cervantes v. Countrywide Home Loans, Inc.* 656 F.3d 1034, 1039 (9th Cir. 2011)..10

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ...................................23

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) ..............................................18, 23

*CFPB v. ITT Educ. Servs.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015) ..........................22

*CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug. 3, 2018) .........................................................................................22

*Clark v. Ocwen Loan Servicing, LLC, No.* 17-CV-03027, 2018 WL 1804349 (N.D. Ga. Jan. 18, 2018) ..................................................................................13

*Dauenhauer v. Bank of New York Mellon*, 562 F. App'x 473 (6th Cir. 2014).........8, 9

*Davis v. Select Portfolio Serv. Inc.*, No. 1:17-CV-02359, 2017 WL 8186844 (N.D. Ga. Nov. 13, 2017) ...............................................................................13

*Demilio v. Citizens Home Loans, Inc.*, No. 3:12-CV-81 (CAR), 2013 WL 331211 (M.D. Ga. Jan. 29, 2013) ............................................................................13

*EverBank, N.A. v. Seedergy Ventures, Inc.*, 499 S.W.3d 534, 536 (Tex. App. 2016)12

*FTC v. Consumer Def. LLC*, 926 F.3d 1208 (9th Cir. 2019).....................................16

*FTC v. Cyberspace.Com LLC*, 453 F.3d 1196 (9th Cir. 2006) ..........................18, 20

*FTC v. Good Ebusiness, LLC*, No. 2:16-cv-01048-ODW-JPR, 2016 WL 3704489 (C.D. Cal. July 12, 2016)............................................................................17

*FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015).............................................20

*FTC v. Lucas*, 483 F. App'x 378 (9th Cir. 2012).....................................................18

*FTC v. Mortg. Relief Advocates LLC,* No. CV145434MWFAGRX, 2015 WL 11257575 (C.D. Cal. July 1, 2015) .............................................................21

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997).................23, 24

*FTC v. Warner Communications, Inc.*, 742 F.2d 1156 (9th Cir. 1984)...................24

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) .......................16, 24

*Golliday v. Chase Home Fin., LLC*, No. 1:10–cv–532, 2011 WL 4352554, at *7 (W.D. Mich. Aug. 23, 2011)........................................................................10

*Goode v. PennyMac Loan Servs., LLC*, No. 14 C 01900, 2014 WL 6461689 (N.D. Ill. Nov. 18, 2014) ..................................................................................14

*Hakimi v. Bank of New York Mellon*, No. 2:14-CV-2215, 2015 WL 2097872 (D. Nev. May 5, 2015) ....................................................................................13

*Hellmuth v. Bank of Am., N.A.*, No. H042544, 2017 WL 1880969 (Cal. Ct. App. May 9, 2017) ..................................................................................................10

*HSBC Bank USA, Nat'l Ass'n for PHH 2007-1 v. Joseph*, No. FBTCV126029126S, 2017 WL 3671334 (Conn. Super. Ct. July 17, 2017) ................................10

*Hylton v. J.P. Morgan Chase Bank, N.A.*, 338 F. Supp. 3d 263 (S.D.N.Y. 2018) .....13

*In re Rivera, No.* ADV 13-01650, 2014 WL 7331082 (B.A.P. 9th Cir. Dec. 23, 2014) ..................................................................................................................... 8

*In re Trierweiler*, 484 B.R. 783, 791–92 (B.A.P. 10th Cir. 2012), *aff'd*, 570 F. App'x 766 (10th Cir. 2014) ..................................................................................10

*JPMorgan Chase Bank, N.A. v. Jenkins*, No. 14 C 4278, 2016 WL 4417072 (N.D. Ill. Aug. 18, 2016) ..................................................................................14

*Kling v. Bank of Am., N.A.*, No. CV 13-2648 DSF (CWX), 2014 WL 12567788 (C.D. Cal. July 8, 2014) ..........................................................................14

*Leadbeater v. JPMorgan Chase, N.A*, No. CV 16-7655 (JMV), 2017 WL 4790384 (D.N.J. Oct. 24, 2017) ..................................................................................14

*Martins v. BAC Home Loans Servicing, LP*, 722 F.3d 249, 255 (5th Cir. 2013) .......10

*McGough v. Wells Fargo Bank, N.A.*, No. C12-0050 TEH, 2012 WL 6019108 (N.D. Cal. Dec. 3, 2012) ..........................................................................13, 14

*Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79 (2d Cir. 2014) .....................10

*Sarkar v. World Sav. FSB*, No. C 13-4375, 2014 WL 457901 (N.D. Cal. Jan. 31, 2014) ..................................................................................................................13

*Seedergy Ventures, Inc. v. Kellibrook Mortgage Partners, Ltd, et al.*, No. 2013-72329, 2015 WL 10567934, at *1 (Tex. Dist. June 15, 2015) ..........................12

*Sigaran v. U.S. Bank Nat'l Ass'n*, 560 F. App'x 410 (5th Cir. 2014) .......................10

*Stephens v. Bank of Am. Home Loans, Inc.*, No. 6-CV-660, 2017 WL 384315 (E.D.N.C. Jan. 25, 2017) ..............................................................................13

*Sylvester v. Interbay Funding LLC*, No. 15-CV-1736 (JPO), 2017 WL 4382056 (S.D.N.Y. Sept. 29, 2017) ..............................................................................14

*Warren v. Hancock Mortg. Corp.*, No. CV 16-00514, 2016 WL 6689092 (W.D. La. Oct. 6, 2016) ..................................................................................................13

**Statutes and Regulation**

12 C.F.R. § 1015.2 ........................................................................................................17

12 C.F.R. § 1015.3(b) ............................................................................................18

12 C.F.R. § 1015.3(c).......................................................................................18, 21

12 C.F.R. § 1015.5(a) ...........................................................................................17

12 U.S.C. § 5481(15)(A)(viii)(II) .........................................................................16

12 U.S.C. § 5481(25)(B) .......................................................................................17

12 U.S.C. § 5481(25)(C)(i) ...................................................................................17

12 U.S.C. § 5481(6) ..............................................................................................16

12 U.S.C. § 5531.....................................................................................................2

12 U.S.C. § 5531(d)(2)(A) ....................................................................................22

12 U.S.C. § 5536..............................................................................................2, 22

12 U.S.C. § 5564(a) ..............................................................................................16

12 U.S.C. § 5565(a) ..............................................................................................16

16 C.F.R. part 322 ..................................................................................................2

75 Fed. Reg. 75,092, 75,117 (Dec. 1, 2010) ........................................................23

**Other Authorities**

Webster's Third New Int'l Dictionary 2331 (3d ed.1993) ......................................22

# INTRODUCTION

Since at least 2014, Defendants Certified Forensic Loan Auditors (CA), Certified Forensic Loan Auditors (TX) (CFLA), and Andrew Lehman (collectively Defendants) have deceptively marketed their mortgage-assistance relief products and charged consumers facing potential foreclosure millions of dollars in illegal upfront fees. Their operation continues today, and because of the economic fallout from the COVID-19 pandemic, Defendants are positioned to take further advantage of consumers struggling to pay their mortgages. Defendants continue to make empty promises that their products will help consumers avoid foreclosure, and continue to charge illegal upfront fees for these products. The Bureau of Consumer Financial Protection (Bureau) seeks a preliminary injunction barring Defendants from selling their mortgage-assistance relief products, which will prevent Defendants from exploiting this situation and continuing to harm vulnerable consumers throughout the country.

Defendants falsely tell consumers that, for an upfront fee of $1,495, Defendants' "Quiet Title Package" will solve consumers' foreclosure problems. This package includes a Securitization Audit (Audit) of their mortgage, which CFLA claims will identify flaws in the securitization of the consumer's mortgage, thus providing a defense to foreclosure. The package also includes Litigation Documents, consisting of a civil complaint and other documents that CFLA promises will "prevent foreclosure" and provide a "powerful and successful means of bringing suit against your mortgage lender." Exhibit A to Vaughn Decl. in Supp. of Plaintiff's Mem. ("Ex.") A at p. 5, 7. Defendants claim that "experts" prepare these products and that CFLA is attorney-owned and -operated. *Id.* at p. 4, 6, 7. But none of this is true. Instead, CFLA's Audits are about 40 pages of what some courts have called unwarranted deductions of facts and legal conclusions masquerading as facts, some of which Lehman candidly admitted were "boilerplate" and "garbage." CFLA's

Litigation Documents are purportedly based on the Audit findings, but in reality are templates that Defendants' staff fills in with the consumer's basic information.

Though CFLA has sold more than 2,000 of these Audits since 2014, Defendants have not been able to point to a single case where their products delivered as promised. Instead, courts faced with these products have consistently rejected them, with at least one court calling them likely the product of charlatans preying on people in economically dire situations.

Defendants' conduct violates the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a); and Regulation O, 12 C.F.R. pt. 1015, which governs the marketing and sale of mortgage assistance relief services.[1]

The Bureau requests this Court halt these illegal practices. A preliminary injunction is appropriate here. The Bureau is likely to succeed on the merits given the significant volume of evidence, including Defendants' own testimony, showing that Defendants are violating the CFPA and Regulation O. And the equities favor granting the Bureau's requested relief. Defendants continue their illegal operation notwithstanding a track record of federal courts rejecting their services as useless, and the resignation of their sole "auditor," Defendant Michael Carrigan, who already stipulated to a judgment barring him from producing these Audits. *See* Dkt. 25. Even as this motion is pending, Defendants continue to sell their Audits and Litigation Documents, Ex. A at p. 5-8; Ex. B at p. 5-10, have launched a new company, and represent that they are expanding their business into the international marketplace. Ex. C.

The Court should enter a preliminary injunction (1) enjoining Defendants' illegal practices; and (2) preventing Defendants from producing, marketing, or

---

[1] The FTC originally published the MARS Rule at 16 C.F.R. part 322, and published this guidance when it had rulemaking authority over the rule. Section 1097 of the CFPA transferred rulemaking authority for this rule to the Bureau effective July 21, 2011. The Bureau republished the rule at 12 C.F.R. part 1015, "Mortgage Assistance Relief Services (Regulation O)."

selling, or assisting others in the production, marketing or sale of consumer financial products or services and mortgage-assistance relief services.

## STATEMENT OF FACTS

### I.  Defendants' mortgage-assistance relief operations.

Defendants' primary products are its Securitization Audits and its Litigation Documents. Defendants market their products through their webpage, marketing emails, and phone solicitations. Consumers can initiate the purchase of Defendants' products over the phone or online; prior to purchase they must execute an online agreement through Defendants' webpage. Ex. D at 68:15-69:10. Defendants sell these products both directly to consumers facing foreclosure, and to entities purporting to represent consumers in foreclosure. In marketing materials, Defendants claim their products will "prevent foreclosure," are "a powerful and successful legal means of bringing suit against your mortgage lender," and that they will help consumers leverage lawsuits to negotiate loan modifications. Ex. A at p. 5.

Each Audit is about 40 pages and is filled with confused verbiage about the consumer's mortgage and the mortgage industry generally. *See e.g.*, Ex. E. at p. 3-31, 37-45. Each Audit claims to identify the entities involved in the origination, transfer, and securitization of a mortgage, as well as the Residential Mortgage Backed Securities (RMBS) trust holding the mortgage. *See id.* at p. 2, 8, 9, 12, 13, 31. And each Audit includes almost exclusively boilerplate conclusions that the mortgage holder no longer has the right to foreclose because of various supposed defects in the assignment or securitization of the mortgage. *See id.* at p. 19, 25-28, 40-45.

The supporting Litigation Documents include a civil complaint against the mortgage lender, holder, or servicer; a lis pendens; and a temporary restraining order. Ex. A at p. 5-7.

Defendants charge consumers $1,495 for the Audits and Litigation Documents, which they market together as a "Quiet Title Package." Ex. F. at p. 22-23 ($995.00 for the Audit, $500.00 for the Litigation Documents). They collect those

fees before Defendants deliver the Audits and before consumers obtain any mortgage relief. Ex. D, at 68:15-69:10; Ex. Y-CC; Ex. DD at p. 37, 46, 49.

Since 2014, CFLA has sold more than 2,000 Audits and Litigation Documents, taking in more than $3 million in revenue.

**A. Defendants' marketing of the Audits and Litigation Documents.**

On CFLA's website, Defendants characterize the Audits and Litigation Documents as "a Complete turn-key lawsuit to sue your lender for damages." Ex. A at p.6. Defendants also tell consumers:

- the Audits "stop foreclosure," Ex. II. at p.4;
- the Audits will "keep homeowners in their homes," *id.*;
- the Audits and Litigation Documents "prevent foreclosure" and are "a powerful and successful legal means of bringing suit against your mortgage lender"; the Audits are "advanced," "cutting edge," and tailored to each consumer, Ex. A at p. 4-8; Ex. II at p. 6, 7;
- "The Temporary Restraining order is designed [to] STOP A SALE IMMEDIATELY to give the attorney time to fight the bank in favor of the Homeowner and the Lis Pendens will cloud the title, making it very difficult for the bank to take possession of the home and resell it, so a solution can be reached in favor of the Homeowners," Ex. A at p. 6; Ex. II at 6;
- the Audits are "the most advanced Audit Report on Residential Mortgages in existence," Ex. A at p. 6; Ex. II at p. 6, 7.

Defendants' website also features purported testimonials that claim the Audits are effective, including the following two examples:

- "Thinking there was no hope I found Certified Forensic and decided to try a securitization audit. . . Chase unilaterally dismissed my state foreclosure case without any notice or discussions. James Farah."

- "Thank you for the support over the years. We just beat the bank in court to save house and prevent eviction. Their case was denied. Jeff Castillo."

Ex. G at p.4-5. In reality, foreclosure orders were entered against both consumers. Ex. H at p. 1 and Ex. I at p. 13. And despite requests, Defendants have not produced evidence validating the other testimonials on its website.

CFLA also pushes the effectiveness of its Audits and Litigation Documents in marketing emails and phone solicitations. Ex. K at p.1 ("Please Contact CFLA . . . immediately to ascertain what you are entitled to in damages . . . We have Attorneys in all 50 States."). In calls with undercover Bureau investigators posing as consumers, CFLA employees promised that CFLA's Audits would stop their foreclosures or help them leverage litigation to negotiate favorable settlements. Ex. J at ¶ 3.

Defendants' marketing also makes representations about the qualifications of the individuals preparing the Audits. CFLA claims on its website that it is attorney-owned and -operated and that its Quiet Title Package is prepared by the "Nation's Most Well Respected Attorneys in the Foreclosure Defense industry." Ex. A at p.5. And in sales calls, Defendants tell consumers that the Litigation Documents are prepared by CFLA attorneys. Ex. J at ¶3. As we detail below, these claims are false.

Defendants' marketing claimed that Carrigan manages 25 auditors and that he is a "leading" expert in the residential mortgage industry. Ex. A at p.4, Ex. FF at p.4. Defendants claim that "CFLA Auditors have been admitted as Experts in nearly every jurisdiction nationwide" and they have "a minimum of 10 years of industry related experience. . ."  Ex. A at p.4. CFLA also claims it is a "subscriber of Bloomberg. . ." *Id.* at p.8. As we detail below, these claims are false.

**B. Lehman is the president and founder of CFLA and has managerial responsibility for the company.**

Andrew Lehman is the founder, president, and sole owner of CFLA TX and CFLA CA. CFLA is not attorney-owned or -operated: Lehman is not an attorney and he has never held a law license. Ex. D at 191:16-20. According to Lehman, he is the "visionary behind all of the cutting edge innovation that CFLA has brought to the market for Foreclosure Defense." Ex. L. at p. 29. Lehman has managerial responsibility for CFLA, is in charge of compliance, and trained most of CFLA's sales personnel. Ex. D at 47:4-20.

In addition to having managerial responsibility, Lehman has performed day-to-day duties, interacting with consumers, and selling Audits and Litigation Documents. Ex. M at ¶¶ 31, 33. He also directs and participates in the production of CFLA's Audits. *Id*. at ¶33. Until Michael Carrigan's 2019 departure, CFLA provided templates Carrigan used to produce the Audits, and Lehman directed Carrigan to add or remove sections of the Audits. Ex. N at 13:20-14:4, 126:11-17.

In 2018, Lehman testified that he has "never prepared an audit, and I don't think I could if you asked me to." Ex. D at 304:23-305:2. But since Carrigan's departure, CFLA claims that Lehman prepares the Audits. Ex. M at ¶33, Ex. O at 14.

Presently, Lehman is CFLA's sole employee, working with two independent contractors who help him with data entry. Ex. M at ¶ 31.

**C. From 2014 through 2019, Carrigan was CFLA's exclusive "auditor," and assembled the Audits based on CFLA templates.**

From 2014 until mid-2019, each Audit that CFLA sold was principally produced by Michael Carrigan. Ex. P at p. 4. Carrigan has no legal training, does not have any particularized expertise in the residential mortgage industry, and he testified he would "never tell someone that I am an expert in RMBS securitization." Ex. N, at 189:13-18; 46:5-9. He has no expertise in determining which state law applies during a foreclosure action. *Id*. at 105:19-23. He does not consider himself an expert in the loan modification process for residential mortgages. *Id*. at 54:18-20. Carrigan does not have any expertise in the regulations that apply to banks when

recording assignments of residential mortgages. *Id.* at 74:23-75:1. As of January 2019, he held no active professional licenses. *Id*. at 45:4-6.

Carrigan has never been qualified as an expert witness in any court, *id.* at 83:2-4; 85:9-21, and he estimated that he has only "appeared" in open court "maybe a half dozen times," but he was not permitted to speak in at least two of those instances, *id.* at 87:13-88:20.

For each Audit, Carrigan started with a template CFLA provided, and then supplemented that template with publicly available information he deemed relevant to the ownership, assignment, and securitization of the mortgage. The Audits typically include screenshots from a database maintained by the financial reporting company Bloomberg LP that CFLA claims shows information about the securitization of the mortgage. Ex. E at p. 31-36. Defendants do not hold a Bloomberg subscription and obtained Bloomberg data by sending an individual to a Connecticut public library that provides free Bloomberg access. Ex. N at 76:23-77:1. The Audits also included documents purportedly related to the securitization, like prospectus supplements. Ex. E at p. 3-6, 10-11.

Carrigan's goal was to complete each Audit in two and a half hours. Ex. N at 80:13-17. He generally did not read them through before completing them. *Id.* at 172:24-173:21.

Carrigan never managed a team of 25 auditors, though at times he did have assistants who helped with the "clerical input" of information. Ex. N at 110:7-11; 75:14-18; *see also* Ex. P at 2-4 (listing 16 total employees/contractors of CFLA). Attorneys do not prepare the Audits. Ex. D, at 191:4-6; 191:16-20; 192:4-7.

Carrigan did not prepare the CFLA Litigation Documents and neither did attorneys. Instead, CFLA's web administrator prepared those documents based on templates, adding minimal information, such as the consumer's name and the property address. Ex. F at p. 2, Ex. P at p. 2, 4.

**II.    CFLA's Audits incorrectly claim that the right to foreclose on the**

1    underlying mortgage has been "lost."

2        There are three core conclusions in each Audit, in various formulations,

3    claiming that the right to foreclose on the mortgage has been "lost." Ex. E at p. 43.

4    These conclusions are legally unsupported. *First*, each Audit claims that the

5    securitization of the mortgage prevents foreclosure. *Second*, CFLA says that the

6    assignment of the mortgage via the Mortgage Electronic Registration System

7    (MERS)[2] "split" the note from the deed, which also prevents foreclosure. And, *third*,

8    the Audits claim that violating securitization trust documents, like a pooling and

9    servicing agreement, prevents the right to foreclosure.

10       None of these conclusions is accurate.

11   **A. CFLA's Audits incorrectly claim that the securitization of the consumer's**

12   **mortgage eliminates the right to foreclose.**

13       Each of CFLA's Audits claims that, when the mortgage is securitized, this

14   eliminates the right to foreclose under the mortgage, including language like the

15   following:

16       Once a loan has been securitized, which the aforementioned loan may

17       have been done [sic] many times, that event would indicate that the

18       loan forever loses its security component (i.e., the Deed of Trust), and

19       the right to foreclose through the Mortgage is forever lost.

20   Ex E at p. 43.

21       CFLA makes no effort to determine whether this conclusion is appropriate for

22   the mortgage being "audited." And there is no legal authority supporting this

23   assertion; the securitization of a mortgage is simply not a defense to foreclosure. *See,*

24   *e.g.*, *Dauenhauer v. Bank of New York Mellon*, 562 F. App'x 473, 480 (6th Cir.

25   2014); *In re Rivera, No*. ADV 13-01650, 2014 WL 7331082, at *4 (B.A.P. 9th Cir.

26

27   ――――――――――――――――
[2] MERS is a national electronic database that tracks changes in mortgage servicing
28   and beneficial ownership interests in residential mortgage loans.

Dec. 23, 2014), *aff'd*, 676 F. App'x 714 (9th Cir. 2017); *Baker v. CitiMortgage, Inc.*, No. 17CV02271SRNKMM, 2018 WL 1838060, at *6 (D. Minn. Apr. 18, 2018), *aff'd*, 753 F. App'x 428 (8th Cir. 2019).

Lehman characterized these conclusions as "boilerplate, conclusory bullshit." Ex. D, 139:11-22. As to whether securitization eliminates the right to foreclose, Lehman testified that he was not "sure the veracity of this statement, whether that statement is true or false, because that's a legal question that I'm not even in a position to answer." *Id.* at 148:16-25.

For his part, Carrigan testified that "state laws vary quite a bit" and that he could not conclude "that [a] mortgage can never be foreclosed" when securitized. Ex. N at 170:6-171:2. That conclusion, he said, "oversteps," *id.* at 171:2, he should have removed such conclusions from the Audits, *id.* at 173:6-21, and he was not comfortable that they were in the Audits, *id.* at 172:24-173:12. Carrigan has also previously testified in depositions that, despite a securitization, "you can still foreclose. . ." *Id.* at 170:15-23.

**B. CFLA's Audits incorrectly claim that assignment of the mortgage through MERS eliminates the right to foreclose.**

CFLA also claims in its Audits that the assignment of the mortgage via MERS "splits" the note from the deed, which also eliminates the right to foreclose:

Generally, if the Deed of Trust and the Note are not together with the same entity, there can be no legal enforcement of the Note. The Deed of Trust enforces the Note and provides the capability for the lender to foreclose on the property.

Ex. E at p. 42

This conclusion is inaccurate and does not provide a defense to foreclosure. Courts have consistently held that assignments through MERS do not eliminate the right to foreclose. *See, e.g., Dauenhauer v. Bank of New York Mellon*, 562 F. App'x

473, 479 (6th Cir. 2014); *Golliday v. Chase Home Fin., LLC*, No. 1:10–cv–532, 2011 WL 4352554, at *7 (W.D. Mich. Aug. 23, 2011); *Cervantes v. Countrywide Home Loans, Inc*. 656 F.3d 1034, 1039 (9th Cir. 2011); *In re Trierweiler*, 484 B.R. 783, 791–92 (B.A.P. 10th Cir. 2012), *aff'd*, 570 F. App'x 766 (10th Cir. 2014); *Martins v. BAC Home Loans Servicing, LP*, 722 F.3d 249, 255 (5th Cir. 2013).

## C. CFLA's Audits incorrectly claim that violating securitization trust documents eliminates the right to foreclose.

CFLA's Audits also claim that violating securitization trust documents, like a pooling and servicing agreement, eliminates the right to foreclose, for example, claiming that:

> the true original loan Note and Deed of Trust had to be provided by the Document Custodian certified to have been in possession of them by October 29, 2004. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement.

Ex. E at 43.

Numerous courts have held that violating trust documents, like pooling and servicing agreements, is also not a defense to foreclosure. *Hellmuth v. Bank of Am., N.A.*, No. H042544, 2017 WL 1880969, at *8 (Cal. Ct. App. May 9, 2017) (unpublished); *see also HSBC Bank USA, Nat'l Ass'n for PHH 2007-1 v. Joseph*, No. FBTCV126029126S, 2017 WL 3671334, at *3 (Conn. Super. Ct. July 17, 2017); *Rajamin v. Deutsche Bank Nat'l Tr. Co*., 757 F.3d 79, 88–90 (2d Cir. 2014); *Sigaran v. U.S. Bank Nat'l Ass'n*, 560 F. App'x 410, 413 (5th Cir. 2014).

## III.    CFLA's Audits purported to identify the trust holding the consumer's mortgage, but frequently did not.

A central advertised feature of CFLA's Audits was that they would purportedly identify which RMBS trust held the consumer's mortgage. But for nearly half of Audits Carrigan completed (1,008 out of 2,175), he could not do this.

Ex. J at ¶ 4. The marketplace for securitizations is dominated by the Government Sponsored Entities (GSEs)—e.g., Fannie Mae, Freddie Mac, and Ginnie Mae. Ex N at 106:14-18. The GSEs do not report their holdings on Bloomberg, which was Carrigan's sole source of securitization information. Ex. N at 107:6-108:5; Ex. D at 156:24-158:5.

When he could not locate a consumer's mortgage in a trust, Carrigan would generally identify a potential trust he thought *might* hold the mortgage. Ex. N, 107:10-108:12. He often erroneously picked trusts that held other RMBS—not individual mortgages. *E.g.*, Ex. E at 10 ("The trust will own Fannie Mae MBS. . . ). According to Carrigan, these "no-find" Audits were intended to be an example, not a true audit. Ex. N, 145:7-8; 140:22-25. The hypothetical nature of his Audits was only explained to consumers if they "pressed" for additional information, which was "[n]ot very often." Ex N, 145:9-25. Carrigan conceded that consumers "might get confused" by the hypothetical nature of the Audits. *Id.* at 146:5-11. For good reason; these "no find" Audits contained the same analysis and boilerplate conclusions and recommendations as all the others. *Id.* at 145:7-146:11; 140:22-25; Ex. E at p. 42-43.

## IV.    CFLA's Audits were not effective at defeating foreclosure actions or obtaining loan modifications.

CFLA promises that its Audits and litigation documents will keep homeowners in their homes, prevent foreclosure, and will be a powerful and successful legal means of bringing suit against the consumer's mortgage lender. These claims are not true. Many homeowners have attempted, and failed, to defend foreclosure actions and prosecute affirmative suits using CFLA's Audits and Litigation Documents. And CFLA has not identified a single case in which a consumer ultimately prevailed because of CFLA's products, and many consumers have complained that CFLA's products were useless.

**A. Courts have consistently rejected CFLA's Audits and Defendants did not identify any cases in which consumers ultimately prevailed because of CFLA's products.**

Defendants have not identified a single instance in which a homeowner in foreclosure prevailed on the merits by using an Audit. Instead, Defendants have produced troves of misleading information to the Bureau regarding consumers' use of CFLA Audits. In a pre-suit letter arguing that the Bureau should not file a lawsuit, Defendants vaguely described three cases to argue that their Audits were used successfully. None of the cases appears to support such a claim. Ex. L at p. 21-22. Carrigan testified that in one of the cases the homeowner was offered a settlement amount, but "they are still fighting to stay in the house," and he had not "reviewed the judgment." Ex. N at 36:9-19. The second case appears to have been overturned on appeal. Ex. L at p.21-22; *see also Seedergy Ventures, Inc. v. Kellibrook Mortgage Partners, Ltd, et al*., No. 2013-72329, 2015 WL 10567934, at *1 (Tex. Dist. June 15, 2015), *rev'd sub nom*., *EverBank, N.A. v. Seedergy Ventures, Inc*., 499 S.W.3d 534, 536 (Tex. App. 2016). And Carrigan testified that in the third case the property "had already been foreclosed." Ex. N, 37:22-38:2. When asked in interrogatories to identify cases in which CFLA's Audits were used successfully, Defendants responded with pages of case summaries and citations that had no connection to CFLA. *See* Ex. F at 27-40; Ex. J at ¶5; Ex. Q; Ex. R at 11-36; Ex. S at 3-4. After the Bureau threatened to pursue sanctions in this action for providing false interrogatory responses, Ex. S at 3-4, Defendants served an interrogatory response identifying nine cases in which they said its Audits and litigation documents were "successfully utilized." Ex. T at p.2-4. Of those nine cases, six ended in defeat for the homeowners. *See* Exs. H, I, U, V, W, X. In the seventh, the homeowner did not get their property "free and clear," as CFLA claimed—the mortgage holder voluntarily dismissed the case without prejudice and simultaneously decelerated and reinstituted the loan. Ex. EE. Of the two remaining cases identified, Defendants claimed they

were waiting for discovery "to ascertain . . . what happened that made this case favorable to the client." Ex. T at p. 8 ¶ g-9 ¶ i.

In fact, multiple litigants have attempted unsuccessfully to use the Audits in litigation, which led one court presented with a CFLA Audit conducted in 2012 to call it "more than likely the product of charlatans who prey upon people in economically dire situation. . ." *Demilio v. Citizens Home Loans, Inc.*, No. 3:12-CV-81 (CAR), 2013 WL 331211, at *3 (M.D. Ga. Jan. 29, 2013) (internal quotations omitted). Another court imposed Rule 11 sanctions on an attorney who relied on a CFLA "Securitization Analysis Report," stating that counsel had a duty to retract her position "once it became clear that the Report was unfounded." *McGough v. Wells Fargo Bank, N.A.*, No. C12-0050 TEH, 2012 WL 6019108, at *3 (N.D. Cal. Dec. 3, 2012). Another court called a Carrigan affidavit "unintelligible," and noted that it contained "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Clark v. Ocwen Loan Servicing, LLC, No*. 17-CV-03027, 2018 WL 1804349, at *2 (N.D. Ga. Jan. 18, 2018). Another court called a CFLA complaint and Audit "frivolous." *Mori El v. Nationstar Mortg.*, No. 1:19-CV-218, 2019 WL 3779552, at *6 (M.D.N.C. Aug. 12, 2019), *report and recommendation adopted sub nom. El v. Nationstar Mortg.*, No. 1:19-CV-218, 2019 WL 4305738 (M.D.N.C. Sept. 11, 2019).

Indeed, the courts rejecting CFLA's Audits are legion. *See, e.g.*, *Hakimi v. Bank of New York Mellon*, No. 2:14-CV-2215, 2015 WL 2097872, at *4 (D. Nev. May 5, 2015); *Davis v. Select Portfolio Serv. Inc.*, No. 1:17-CV-02359, 2017 WL 8186844, at *3 (N.D. Ga. Nov. 13, 2017); *Stephens v. Bank of Am. Home Loans, Inc.*, No. 6-CV-660, 2017 WL 384315, at *1 (E.D.N.C. Jan. 25, 2017); *Warren v. Hancock Mortg. Corp.*, No. CV 16-00514, 2016 WL 6689092, at *4 (W.D. La. Oct. 6, 2016), report and recommendation adopted, No. 16-CV-00514, 2016 WL 6684611 (W.D. La. Nov. 14, 2016); *Barrionuevo v. Chase Bank, N.A.*, No. C-12-0572 EMC, 2013 WL 4103606, at *2-3 (N.D. Cal. Aug. 12, 2013); *Hylton v. J.P. Morgan Chase*

*Bank, N.A.*, 338 F. Supp. 3d 263 (S.D.N.Y. 2018); *JPMorgan Chase Bank, N.A. v. Jenkins*, No. 14 C 4278, 2016 WL 4417072, at *2 (N.D. Ill. Aug. 18, 2016); *Goode v. PennyMac Loan Servs., LLC*, No. 14 C 01900, 2014 WL 6461689, at *5 (N.D. Ill. Nov. 18, 2014); *Sarkar v. World Sav. FSB*, No. C 13-4375, 2014 WL 457901, at *4 (N.D. Cal. Jan. 31, 2014); *Leadbeater v. JPMorgan Chase, N.A*, No. CV 16-7655 (JMV), 2017 WL 4790384, at *4 (D.N.J. Oct. 24, 2017); *Kling v. Bank of Am., N.A.*, No. CV 13-2648 DSF (CWX), 2014 WL 12567788, at *2 (C.D. Cal. July 8, 2014); *McGough v. Wells Fargo Bank, N.A.*, No. C12-0050 TEH, 2012 WL 6019108, at *1 (N.D. Cal. Dec. 3, 2012); *Sylvester v. Interbay Funding LLC*, No. 15-CV-1736 (JPO), 2017 WL 4382056, at *5 (S.D.N.Y. Sept. 29, 2017).

Though courts consistently rejected CFLA's Audits, Carrigan never researched how courts view securitization audits generally, Ex. N, 90:20-23, or considered how courts view CFLA Audits specifically, *id.* at 91:9-21. Rather, CFLA continues to sell the same products again and again to unsuspecting consumers.

In testimony, Carrigan admitted that it would be "very difficult" to prevail in litigation with a CFLA Audit, while Lehman admitted in a pre-suit submission to the Bureau that it was "rare." Ex. N, 35:22-36:5; Ex. L at p. 21-22. These admissions are, in light of the evidence developed, serious understatements.

**B. Many consumers have complained that CFLA's products did not work as promised.**

Consumer complaints also confirm that CFLA's products do not prevent foreclosures or keep consumers in their homes. Numerous consumers complained directly to CFLA that its products were worthless. For example:

> After having this Audit/Lawsuit package evaluated by three attorneys and a judge, it has become clear that it has no value. I recently spoke with Andrew Lehman and was shocked to hear him laugh at the thought that anyone would think they could win a Quiet Title. But this

is exactly what he is advertising. If he had laughed at the idea before I purchased the Audit, then I wouldn't have purchased it!

Ex. Y.

Other homeowners expressed similar sentiments:

I cannot use it at all! I explained everything to you about where my case was and you insisted that this was something I must have and needed to win my case. I found out from experts that this is USELESS and I might as well throw it in the trash at this point in my matter.

Ex. Z; *see also* Ex. AA ("the information provided holds no value to me or my attorney."); Ex. BB (I "was not . . . given what [I] was sold."); Ex. CC ("I will not pay any more money to CFLA for a product that remains incomplete and full of errors.").

Consumer complaints to federal regulators have a consistent theme—the Audits do not provide the promised foreclosure relief:

The unfinished "final" documents we received state that the "audit" information can be obtained by discovery, whereas, the sales pitch indicates that the specialized audit is THE way to obtain the information. The "final" documents also reveal that the securitization audit we paid for is not loan specific, when it was stated it would be.

Ex. DD at p.1.

Another consumer complained that the product was "fraudulent," that it had "no legal basis," did not hold up in court, and almost lost him his home. *Id.* at 7; *see also id.* at 59 ("Their product/service was ALL empty promises just to get your credit card information."); *id.* at 46 ("This company lied to me about this whole case and they are giving families false hope by saying they can help and they know they can't disgusting.").

**ARGUMENT**

When a person violates federal consumer-financial law, the Bureau may seek appropriate relief, including an injunction. 12 U.S.C. § 5564(a). In this action, the Bureau seeks a permanent injunction and other equitable relief to protect consumers from ongoing and future harm and redress for the harm caused by Defendants' CFPA and Regulation O violations. To prevent Defendants from committing further violations during the pendency of this action, the Court should grant the Bureau's motion for a preliminary injunction.

A preliminary injunction in a statutory enforcement action is appropriate when the government agency demonstrates a likelihood of success on the merits and that the balance of equities tips in its favor. *See, e.g., FTC v. Consumer Def. LLC*, 926 F.3d 1208, 1212-14 (9th Cir. 2019) (citing *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989)). Irreparable harm is presumed when a government agency sues under a statute authorizing injunctive relief, as is the case here. *See Consumer Def.*, 926 F.3d 1212-13; *see* 12 U.S.C. § 5565(a)(2). The Bureau meets this standard.

**I.     The Bureau is likely to succeed on the merits.**

The evidence demonstrates that Defendants: (1) violated the CFPA by committing deceptive and abusive acts and practices, (2) violated Regulation O by making prohibited representations and charging advance fees, and (3) violated the CFPA by violating Regulation O.

**A. Defendants are subject to the CFPA and Regulation O.**

Defendants sell Audits and Litigation Documents to consumers for the purpose of avoiding foreclosure. *See supra*, at Section I(A). Defendants are therefore subject to regulation under the CFPA and Regulation O.

Specifically, Defendants are "covered persons" under the CFPA because they offer or provide a service purported "to assist a consumer with . . . avoiding foreclosure." 12 U.S.C. §§ 5481(6), 5481(15)(A)(viii)(II). Defendants, including

Lehman, are also "mortgage assistance relief service providers" under Regulation O because they sell a "service, plan, or program . . . *to the consumer* in exchange for consideration, that is represented, expressly or by implication, *to assist or attempt to assist the consumer with ...* [s]topping, preventing, or postponing any mortgage or deed of trust foreclosure sale for the consumer's dwelling, any repossession of the consumer's dwelling, or otherwise *saving the consumer's dwelling from foreclosure* or repossession." 12 C.F.R. § 1015.2 (emphasis added).

Lehman is also a "covered person" under the CFPA because he is a "related person" under the CFPA. A "related person" includes "any officer, director, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person" or any person "who materially participates in the conduct of the affairs of such covered person." 12 U.S.C. § 5481(25)(C)(i), (ii). Lehman is the sole officer of Defendants CFLA CA and CFLA TX, he managed and controlled the business, and materially participated in the business, including the production and sale of Audits, *see supra* Section I(B). As a "related person," Lehman is a "covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

**B. Defendants violate Regulation O by collecting advance fees.**

Regulation O prohibits mortgage-assistance-relief service providers from receiving "payment of any fee, before the consumer has executed a written agreement with their dwelling loan holder or servicer that incorporates the offer of mortgage assistance relief that the provider obtained." 12 C.F.R. § 1015.5(a); *see also FTC v. Good Ebusiness, LLC*, No. 2:16-cv-01048-ODW-JPR, 2016 WL 3704489, at *4 (C.D. Cal. July 12, 2016). Here, CFLA required consumers to pay for the Audits and Litigation Documents upfront and before the consumers CFLA obtained relief from their loan holder or servicer. Ex. D at 68:15-69:10; *see also* Exs. Y-DD (consumer complaints). Every upfront fee CFLA charged—and any upfront fee CFLA continues to charge under its present structure—violates Regulation O.

**C. Defendants' misrepresentations are deceptive under the CFPA and prohibited representations under Regulation O.**

Under the CFPA, an act or practice is deceptive if "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (internal citation and quotations omitted). A representation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Lucas*, 483 F. App'x 378, 379 (9th Cir. 2012); *cf. Gordon*, 819 F.3d at 1193 n.7 (noting that courts should rely on cases construing the FTC Act when interpreting similar language in the CFPA). Although proof of actual deception is not necessary to establish a violation, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

Similarly, a representation is prohibited under Regulation O if it misrepresents, expressly or by implication, any material aspect of any mortgage assistance relief service, including the likelihood of negotiating, obtaining, or arranging any represented service or result. 12 C.F.R. § 1015.3(b). Prohibited representations include express or implied representations regarding the efficacy of any mortgage assistance relief service unless, at the time such representation is made, the provider possesses and relies upon competent and reliable evidence that substantiates that the representation is true. 12 C.F.R. § 1015.3(c).

Here, Defendants misrepresented the efficacy of their products in providing foreclosure defenses and the qualifications of the individuals that prepared them. Contrary to CFLA's marketing, the products do not "keep homeowners in their homes," do not "stop" or "prevent foreclosure," and do not provide consumers with a successful means for bringing suit against a lender. CFLA is also not attorney-owned

or -operated, and the people compiling the Audits—Carrigan through 2019, and Lehman since then—are not attorneys or experts. As set forth below, these misrepresentations are material and likely to mislead consumers acting reasonably under the circumstances—and consumers have, in fact, been misled by these practices. *See, e.g.*, Ex. Y-DD, GG-HH.

### 1. Defendants misrepresent the efficacy of their services and the qualifications of the people assembling their Audits.

Defendants tell consumers that their Audits and Litigation Documents are prepared by experts, will identify mortgages in RMBS trusts, and will provide meritorious defenses to foreclosure or help them negotiate loan modifications. *See supra* Section I(A). These statements are false.

Defendants' Audits and Litigation Documents are not expert-prepared or prepared by attorneys. Carrigan admits he is not an expert in the relevant areas of the residential mortgage industry. *See supra* Section I(C). He has no idea how the Audits are viewed by courts. *See supra* p. 14. He has never been qualified as an expert witness in court, and only spoken in open court a few times. *See supra* p. 7. Carrigan was not the leader of a team of 25 auditors—he was CFLA's sole auditor and had clerical aides. Lehman admitted he does not know how to prepare an Audit, but he is now CFLA's Auditor. *See supra* p. 7. The Litigation Documents also are not prepared by experts or attorneys. CFLA's web administrator assembled those documents by inputting consumer data into templates.

Moreover, Defendants' Audits and Litigation Documents are not an effective means for foreclosure defense, seeking loan modifications, or to keep consumers in their homes. Carrigan did not defend the conclusions in the Audits. *See supra* p. 9. Lehman called some of the conclusions "bullshit." *See supra* p. 9. Both admitted that success in litigation with an Audit is "very difficult" or "rare." *See supra* p. 14. Indeed, it is all but assured that CFLA's consumers will fail in court using with Defendants' Audits and Litigation Documents because Defendants' Audits advance

baseless legal theories. *See supra* Section II. And beyond the lack of legal support for the Audits, nearly half the Audits Defendants performed and sold are largely hypothetical, since Defendants were not able to identify a trust that held the relevant mortgage. *See supra* Section III.

### 2. Defendants' misrepresentations were likely to mislead reasonable consumers.

These and other representations, are likely to mislead a consumer into believing that if they pay the nearly $1,500 for CFLA's Audits and Litigation Documents, that they would receive viable defenses to foreclosure or assistance with negotiating settlement to a foreclosure proceeding.

And numerous consumers filed complaints confirming that they were, in fact, misled by these misrepresentations. *See, e.g.*, Exs Y-DD. Consumers complained to CFLA that they had been misled and that Defendants' products were not as promised. *See id.* And pro se consumers were convinced they should use the Audits to defend foreclosure proceedings, even though they were ineffective. *See supra* p. 13-14. This evidence of actual deception is highly probative to show that Defendants' marketing practices are likely to mislead consumers acting reasonably under the circumstances. *See Cyberspace.Com LLC*, 453 F.3d at 1201.

### 3. Defendants' misrepresentations are material.

Defendants' representations regarding the content and efficacy of their Audits and Litigation Documents, and the qualifications of the individuals performing the services, are material. A misrepresentation is "material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.Com LLC,* 453 F.3d 1196, 1201 (9th Cir. 2006) (citations omitted). That can include, for example, information about the purpose, efficacy, or cost, of the product or service. *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) (citation omitted). In the context of mortgage relief-related services, the effectiveness of those services "is clearly a central consideration

for the types of consumers at issue in this case." *FTC v. Mortg. Relief Advocates LLC,* No. CV145434MWFAGRX, 2015 WL 11257575, at *4 (C.D. Cal. July 1, 2015); *see also F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) ("Express product claims [regarding effectiveness] are presumed to be material."). Knowing that CFLA's Audits do not provide valid foreclosure defenses and are not prepared by experts or attorneys would likely affect a consumer's choice of using CFLA's services.

> **4.   Defendants' representations are also prohibited under Regulation O because Defendants make them without evidentiary support.**

Defendants' representations regarding the efficacy of their Audits also violate Regulation O because they were not made upon "competent and reliable evidence." 12 C.F.R. § 1015.3(c). Regulation O prohibits mortgage-assistance relief service providers, like Defendants, from making representations regarding the efficacy of their services unless they rely on "competent and reliable evidence," which means: "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by individuals qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." *Id.*

Defendants fail to meet this standard. Carrigan did not attempt to assess whether his Audits were successful in court. *See supra*, p. 14. Lehman did not know how Defendants' Audits are used in court and testified that CFLA does not take steps to track whether they are used successfully. Ex. D, at 103:9-11. When asked to identify cases where CFLA products were used successfully, Defendants produced lists of foreclosure cases having nothing to do with CFLA, or cases in which homeowners lost. *See* Exs. F, R, T, H, I, U-X. Because Defendants' representations regarding the efficacy of their Audits were made without proper evidentiary support, they violate Regulation O.

**D. Defendants' marketing and sale of the Audits and Litigation Documents is abusive under the CFPA.**

The CFPA prohibits abusive acts or practices, including taking unreasonable advantage of a consumer's "lack of understanding . . . of the material risks, costs, or conditions of the product or service." 12 U.S.C. §§ 5531(d)(2)(A), 5536.

Consumers lack an understanding of the risks associated with using CFLA Audits or Litigation Documents for foreclosure defense or mortgage relief. CFLA's target population was consumers facing foreclosure, who are making consequential decisions within a complicated legal and procedural framework, which many did not fully understand. *See* Ex. GG, Declaration of Joseph Worrell, ¶ 5; *cf. CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018) (holding that the Bureau stated a claim for abusiveness where "borrowers lacked an understanding of the law applicable to Defendants' loans and how those laws affected repayment obligations"). Indeed, Lehman himself testified that even he did not understand the Audits. Ex. D at 304:23-305:2.

Carrigan further testified that many of CFLA's pro se clients did not understand the foreclosure process. *See* Ex. N at 85:22-86:2. He also testified that consumers might be "confused" by the hypothetical nature of Audits that fail to find a mortgage in a securitization. *See supra* p. 11. Consumers without legal training or residential mortgage expertise are unlikely to see through CFLA's products for what courts have recognized they are: "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *See Clark*, 2018 WL 1804349, at *2 (internal quotations omitted); *see also* Ex. GG at ¶ 5, Ex. HH at ¶¶ 8-9.

Further supporting an abusiveness claim, Defendants take advantage of their consumers. "The ordinary meaning of 'to take advantage of' is 'to make use of for one's own benefit,' to 'use to advantage,' or to 'profit by.'" *CFPB v. ITT Educ. Servs.*, 219 F. Supp. 3d 878, 918 (S.D. Ind. 2015) (citing Webster's Third New Int'l

Dictionary 2331 (3d ed.1993)). Here, CFLA takes consumers' money, up to $1,495 upfront depending on the service purchased.

The advantage Defendants take of consumers is unreasonable given consumers' lack of understanding of the complexities of foreclosure and of Defendants' purported "expert" services, their precarious financial situation as homeowners facing imminent foreclosure, and the uselessness of the supposed lifeline that Defendants were holding out to desperate consumers.

First, Defendants' business model is essentially built on consumers' lack of understanding about the intricacies of the foreclosure process and the true value of Defendants' Audits. No reasonable consumer who understood what he was getting with the Audits would have purchased one for up to $1,495. *See* Exs. Y-DD.

Second, Defendants' conduct is unreasonable in light of the vulnerable position of Defendants' target audience: consumers facing the risk of foreclosure on their homes. As the FTC found when it first promulgated what is now Regulation O, providers of mortgage-assistance relief services such as Defendants "direct their claims to financially distressed consumers who often are desperate for any solution to their mortgage problems and thus are vulnerable to the providers' purported solutions." 75 Fed. Reg. 75,092, 75,117 (Dec. 1, 2010).

Third, the Audits that Defendants sold to these consumers were meritless, as CFLA and Lehman knew, calling some conclusions "boilerplate" and "garbage." Both Carrigan and Lehman described success in litigation with an Audit as unlikely. *See supra* p. 14. But Defendants sell them to consumers anyway, with a promise that they would prevent foreclosure and keep consumers in their homes.

## E. Andrew Lehman is individually liable under the CFPA.

Injunctive relief binding Lehman is appropriate here either because he "participated directly in the violations or had authority to control" CFLA. *See FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997); *cf. CFPB v. Gordon*, 819 F.3d

1179, 1193 (9th Cir. 2016). A person's role and authority within a company can demonstrate the requisite control. *See Publ'g Clearing House, Inc.*, 104 F.3d at 1170. Here, Lehman participated directly in the acts central to CFLA's violations, and had the authority to control the company. *See supra* Section I(B). Lehman is the sole owner and officer of CFLA and as such had the authority to control, and did in fact, control CFLA. *Id.* Lehman trained most of CFLA's staff. *Id.* He directed and participated in the production of Audits by telling Carrigan when to produce one, and by controlling the templates Carrigan used for the Audits. By his own telling, Lehman is the "visionary behind all of the cutting edge innovation that CFLA has brought to the market for Foreclosure Defense." And Lehman is currently holding himself out as CFLA's primary Auditor. *See supra* p. 6.

## II.     The balance of equities weighs in the Bureau's favor.

The balance of equities here weighs in the Bureau's favor and support issuing a preliminary injunction. When balancing equities where the public interest is involved, courts accord greater weight to the public interest than to private interests. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (citing *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984)). In this context, public equities include "economic effects and pro-competitive advantages for consumers and effective relief" for the agency bringing a statutory enforcement action. *Id.* The public equities here are significant and include stopping deliberate efforts to continue a sham operation that harms consumers, including by charging homeowners facing foreclosure more than a thousand dollars in illegal upfront fees for a service that will not help them stay in their home.

The relief the Bureau seeks here would protect consumers' interests. Defendants' illegal conduct continues—they continue to sell Audits, and continue to use the same deceptive marketing described above. At the time of this filing, Lehman is in the process of "rebranding" CFLA to expand and focus on international markets. Ex. C. And now, Lehman assembles the Audits, even though he testified in

2018 that he did not understand the Audits and could not perform one. Defendants continue to tell consumers that the Audits and Litigation Documents are an effective foreclosure defense or means to seek a loan modification. Exs. A-C. They continue to charge consumers before rendering their services, and they continue to train others how to produce substantially similar audits. *Id.* Lehman has also launched a new company, Ex. C, indicating that Defendants' illegal conduct will continue unless this Court grants an injunction.

The Bureau does not lightly invoke the current pandemic, but products such as those sold by Defendants will provide false hope to many distressed consumers in the days and months to come. The injunctive relief the Bureau seeks from the Court will protect consumers from this predatory and abusive conduct.

## CONCLUSION

For the foregoing reasons, the Court should grant the Bureau's motion for preliminary injunction as set forth in the Proposed Order filed with this motion.

Dated: April 23, 2020       Respectfully submitted,

/s/ Benjamin Vaughn
Leanne E. Hartmann
Benjamin Vaughn (pro hac vice)
Gabriel Hopkins (pro hac vice)

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff*
*Bureau of Consumer Financial Protection*