Exhibit N

Page 1

CONSUMER FINANCIAL PROTECTION BUREAU

IN THE MATTER OF:          )
                          )
CERTIFIED FORENSIC LOAN    ) Case No. 2016-1660-02
AUDITORS, LLC.            )
                          )
_____)

Room 7516
300 North Los Angeles Street
Los Angeles, California
Tuesday,
January 8, 2019

The investigational hearing testimony of
MICHAEL CARRIGAN, commenced, pursuant to notice, at
9:00 a.m.

* * *

Page 3

1          I N D E X
2    WITNESS
3    MICHAEL CARRIGAN
4
5
6
7
8          E X H I B I T S
9
10                          PAGE
11
     1 - Civil Investigative Demand, Michael Carrigan   7
12
     2 - Property Securitization Analysis Report,     108
13     Lawrence L. Berardi
14   3 - Affidavit of Facts               127
15   4 - Property Securitization Analysis Report,   209
       Lydia H. Crayton
16
17
18
19
20
21
22
23
24
25

Page 2

1    APPEARANCES:
2    For Consumer Financial Protection Bureau:
     BENJAMIN E. VAUGHN, Attorney at Law
3       -and-
     GABRIEL S.H. HOPKINS, Attorney at Law
4    1700 G Street NW
     Washington, DC  20552
5    (202) 435-7964
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    LOS ANGELES, CALIFORNIA, TUESDAY, JANUARY 8, 2019
2              9:00 a.m.
3
4         MICHAEL CARRIGAN,
5    called as a witness on behalf of the Financial Protection
6    Bureau, having been administered an affirmation, was
7    examined and testified as follows:
8
9              EXAMINATION
10   BY MR. VAUGHN:
11      Q   Mr. Carrigan, could you state your full name for
12   the record, please.
13      A   Michael Robert Carrigan.
14      Q   For the record, in the hearing room today also
15   in addition to our court reporter is myself, Benjamin
16   Vaughn, and my colleague, Gabe Hopkins.  We are
17   enforcement attorneys with the Consumer Financial
18   Protection Bureau.  We're going to go through kind of some
19   opening stuff and background stuff.
20      Right off the bat -- we talked about this
21   earlier -- but you are not represented by counsel;
22   correct?
23      A   Well, only by him who -- to whom all power and
24   authority are given as referenced in Psalm 2 in the Gospel
25   of John.

Page 13

1  County recordings and other recordings and draw certain
2  deductive and inductive conclusions. So he may be more
3  knowledgeable than myself in some areas, and I may be more
4  knowledgeable than him in the mechanics of how the reports
5  are put together.
6      Q   So you were saying -- when you were saying the
7  legal theories, I think you said backing the
8  securitization audits, can you explain to me what you
9  meant by that?
10      A   That is what I would suppose. I'm not an
11  attorney.
12      Q   I guess I meant when you say the legal theories
13  backing the audits -- and please rephrase if I am
14  mischaracterizing how you said it -- but what is that you
15  mean by that?
16      A   The arguments.
17      Q   That's something that you would rely on
18  Mr. Lehman for in terms of --
19      A   If there were --
20      Q   Let me just finish my question so the record is
21  clear. I am going to do it to you later, which I will
22  apologize for.
23         So you would rely on Mr. Lehman for kind of the
24  legal arguments and the legal reasoning and whether or not
25  that's correct and accurate in terms of what the whole

Page 14

1  audit looks like?
2      A   Yes. And I received certain templates from his
3  group, which I used, and I have made some additions or
4  modifications over time, some which were at his direction.
5      Q   How many different templates do you have for
6  performing a securitization audit -- strike that.
7         How many different templates do you have for
8  drafting a securitization audit?
9      A   I have about ten, perhaps. There's several.
10      Q   And all of the templates were generated by CFLA?
11      A   There are basic template starting points, and I
12  had added some sections for particular situations, such as
13  the JP Morgan Chase acquisition of Washington Mutual,
14  another for World Savings type audits. You know, separate
15  ones I had received for Fannie Mae, Freddie Mac, and
16  Ginnie Mae. And I have made some minor modifications to
17  those over time.
18      Q   So had you received -- is it accurate to say
19  that you had received ten or so templates from CFLA and
20  you kind of modified ten of them, or did you receive a
21  couple and you kind of modified them and now you have ten?
22      A   I had received several from them, which I have
23  modified over time.
24      Q   And so maybe based on some of those original
25  buckets of templates now you have a few more?

Page 15

1      A   I also received requests for developing new
2  templates from time to time. There are other asset backed
3  securities that we look at.
4         I had received a student loan template. I had
5  developed something from that template, as I recall, to
6  create a credit card type unsecured loan template. I once
7  did an audit on a boat loan; so I had to modify some
8  things from a car loan template.
9         So I would have to check my email and dates of
10  various files to see what I had received and what had been
11  modified over time, but the stirring points came from
12  information I had received from CFLA.
13      Q   Do you have an understanding -- and let's just
14  focus on residential mortgage loan related templates.
15      A   Okay.
16      Q   Do you have an understanding as to who at CFLA
17  drafted those templates?
18      A   I have not discussed that with Andrew Lehman,
19  except he did ask me once and I told him that I received
20  the templates from someone on his staff when I first
21  joined.
22         There was a fellow named Billy Bowles,
23  B-o-w-l-e-s, who was handling sales, another fellow was
24  named Quinton Murray, M-u-r-r-a-y, and then his assistant
25  was Tiere Lewis, T-i-e-r-e, and I would have received

Page 16

1  templates from one of those folks.
2      Q   And Mr. Lehman asked you who you received them
3  from and that's what you told Mr. Lehman?
4      A   Later he asked me when we were talking about
5  some of the language in the template -- he asked me where
6  that information had come from. And I said that I had
7  received it from his staff, and so he said so you got it
8  from me. And I said yes.
9      Q   Okay. And that was when you started doing
10  securitization audits for CFLA, or around that time?
11      A   There after I started with CFLA, he gave me some
12  new templates, and he wanted me to conform all the work to
13  those templates. Later, as I recall in 2013, he had some
14  additional changes. And I think in 2013 was at that point
15  he had asked me about some of the language, and I said I
16  had received all the templates from his staff.
17      Q   And so over time received had just changes
18  or updates from Mr. Lehman with the request to use new
19  templates instead of the old ones?
20      A   When it was an overall sort of change, yes.
21      Q   Okay.
22         MR. HOPKINS: Just a clarifying question about
23  something you mentioned a little bit ago.
24  BY MR. HOPKINS:
25      Q   You said that you had received some templates

Page 33

1    all the issues around that?  How did you educate yourself
2    on those issues when you went to Avid Law Center?
3        A   I purchased two properties in Las Vegas without
4    clear title.  In one case, I sued Bank of America for
5    clear title, not being the real party in interest, and
6    they said the same thing about me.  They said that I
7    was -- and I was unwilling to provide legal tender for the
8    whole amount to put it into escrow.
9            And so I had some education on Nevada law.  And
10   I rented out the property and I used some of those fees
11   for paying legal expense in the hopes of trying to come up
12   with some better deal or even getting clear title.  I
13   found out pretty quickly that getting clear title along
14   with just a securitization audited lawsuit is probably not
15   going to happen in very many cases.
16       Q   And what year was this in?
17       A   2012.
18       Q   And is that what made you kind of want to get in
19   to the fight in terms of --
20       A   I wanted to get into the fight more, so to
21   speak, and help out homeowners directly.  In the case of
22   one of those homes, I wanted to get the homeowner
23   involved.  I realized to be a real party in interest you
24   need to work with the homeowner, and he just wanted to
25   move on so...

Page 34

1        Q   And I think you said in connection with your own
2    property in Nevada it became clear to you that a
3    securitization and a lawsuit wasn't always going to cut
4    it?
5        A   Not for gaining clear title, but perhaps for
6    getting a loan modification.
7        Q   How could -- what do you mean by that, that it
8    could help you get a loan modification?
9        A   When I started with Avid Law Center, I noticed
10   there were a couple of different ways to approach things.
11   One was that one could go directly to the bank, try to
12   work with loss mitigation people maybe who might lose
13   documents or ask for a particular page again and might not
14   get a whole lot of traction.
15           It seemed like another prong to the approach, as
16   Aron Roper explained to me, is you also want to deal with
17   the attorneys on the other side and be more aggressive.
18   He would send over a draft of the lawsuit and a demand for
19   a request letter and securitization audit, temporary
20   restraining order.  And he tended to get a lot better
21   results going through both prongs, either through the
22   regular people who you just call to maybe get more time
23   versus those on the legal side who might be able to
24   actually make a decision.  And so it's a combination of
25   the conventional approach and the more aggressive

Page 35

1    approach.
2        Q   And Aron Rofer was one of the attorneys at Avid?
3        A   The managing attorney.
4        Q   And so by either threatening a lawsuit with a
5    securitization audit or actually filing one that pressure
6    might bring the bank to the table and get them to agree to
7    a loan modification?
8        A   Sometimes it seems compelling; others it's the
9    only way to go.
10       Q   And do you see that as the hopeful outcome as
11   opposed to actually ultimately prevailing on the merits in
12   a lawsuit with a securitization audit?
13       A   Could you repeat that again?
14       Q   Sure.  Of course.
15           In terms of your goal to help homeowners, or
16   your hope, is the hope that a lawsuit with a
17   securitization audit would be a negotiation, for lack of a
18   better term?  Or is your hope that the lawsuit with the
19   securitization audit would actually allow a homeowner to
20   prevail at the end of a lawsuit against the bank?
21       A   It would be a negotiating --
22       Q   In your experience -- it's been six years since
23   2012 -- is it still your view that it's very difficult for
24   a homeowner in foreclosure to prevail finally and
25   ultimately in a lawsuit with a securitization audit?

Page 36

1        A   We need a paradigm shift.  Yes, it is very
2    difficult, given the current state of affairs.
3        Q   And by "current state of affairs," the current
4    way the courts decide these cases?
5        A   Yes.
6        Q   Are you aware of any cases where your
7    securitization audit has allowed a homeowner to finally --
8    and prevail on the merits against the bank?
9        A   There are a few.  Regina Campbell and
10   Stephen Renfrow, S-t-e-p-h-e-n R-e-n-f-r-o-w, earlier this
11   year, I was on my way to court as an expert witness.  They
12   met me at the airport and said en route the court had
13   dismissed the case against them, and JP Morgan Chase had
14   made an offer to them for approximately $80,000 if they
15   would just walk away.
16           And as far as I know, they are still fighting to
17   stay in the house, but from what they told me the case was
18   dismissed without prejudice, but I haven't reviewed the
19   judgment.
20       Q   Let me just follow up on that.  Do you know why
21   the case was dismissed?
22       A   On the merits.
23       Q   Who brought the lawsuit?
24       A   I don't recall.  Florida is a judicial
25   foreclosure state, but I don't recall whether they brought

Page 37

1  an adversarial action or not.
2      Q   And are you aware of other instances where your
3  audit was used where the homeowners prevailed on the
4  merits?
5      A   There was a case that attorneys Chad Elrod,
6  E-l-r-o-d, and Jeff Jackson in the Houston area -- I don't
7  remember the name of the case -- but it was an FHA loan,
8  and the judge ruled in favor of the consumer and said that
9  no one could foreclose on the home, and the ruling was
10  with prejudice.  I could look that one up.
11      Q   That's what I was trying to do right now,
12  actually.  If you give me one second, we can find it at a
13  break if we need to.
14  BY MR. HOPKINS:
15      Q   Do you know if that was an affirmative action
16  brought by the homeowner that Mr. Elrod and Mr. Jackson
17  were representing?
18      A   It would have to be in Texas.  It's a
19  nonjudicial state.
20      MR. VAUGHN:  We'll look it up at a break.
21  BY MR. VAUGHN:
22      Q   Any others that come to mind?
23      A   Patricia Rodriguez worked on a slander of title
24  case.  The property had already been foreclosed.  I did an
25  analysis on the property values.  Between the time of the

Page 38

1  initial loan and the date of the first assignment the
2  judge had awarded, as I recall, about $90,000 in damages.
3      Q   Do you recall the parties in that case?
4      A   No.  I would have to look those up too.
5  BY MR. HOPKINS:
6      Q   Now, that last case, you said that you did a --
7      A   Slander -- property valuation analysis.  I just
8  looked at Zillow, which is ballpark estimate, and I looked
9  at the value of the time of the loan.  And at the time of
10  that analysis and the date of the first assignment,
11  assignments are normally done not at the time of economic
12  transfer but upon default.  So the homeowner would be kept
13  in the dark often as to who they might actually want to
14  negotiate with as a principal.  And so I looked at the
15  drop in property value as a damages.
16  BY MR. HOPKINS:
17      Q   If I understand that, that wasn't the
18  securitization audit that you performed for that --
19      A   It was supplementary information to an audit.
20  BY MR. VAUGHN:
21      Q   Any other cases that you can think of?
22      A   No.  Not definitively.
23      Q   A few questions going back to your employment
24  history.
25      Based on the recitation that you gave, it

Page 39

1  sounded like you left a couple jobs, either because they
2  weren't a good fit, or you were moving on.
3      Is it fair to say you have never been terminated
4  from a position of employment?
5      A   I think there are differences of opinion.
6      Q   Which one are you thinking of, and there can be
7  in these situations --
8      A   Well, I did with E Universe.  They asked me to
9  stay on, and they let me go, but I did give notice to
10  them.
11      Q   Did that feel like more of a mutual departure to
12  you?
13      A   It was a mutual departure.
14      Q   Any other instances?
15      A   At Cars Direct, they brought in someone with
16  more SEC reporting experience than me, and they had to
17  withdraw the initial public offering; so I suppose the
18  company just outgrew me, and there was a lot of people let
19  go.
20      Q   Any other examples?
21      A   Yeah.  Avid Law Center, Aron decided to go into
22  new loan origination; so he fired Tim O'Reilly, myself,
23  another attorney, and 15 law clerks.  And he let me stay
24  in the office and just work some leads and help out his
25  business partner on another business, Power Choice

Page 40

1  Mortgage.  So I was the acting chief financial officer,
2  and I didn't pay them any rent, and I just gave them a few
3  hours of work as I worked on the other business for CFLA
4  for a period of time.
5      Q   How long was that time between being done
6  performing securitization audits for Avid and starting to
7  do them for CFLA?
8      A   I started with Aron in February of 2012.  And
9  by early May of 2012, he already came to me after I had
10  performed 130 audits.  And so I called CFLA.  I had been
11  reviewing some of their work and correcting some of it
12  because Aron's clients would need some extra help.  And so
13  then I was still in Aron's offices until July, at which
14  point I decided not to make the 40-mile drive to Aliso
15  Viejo.
16      Q   And then started working from home?
17      A   Yes.
18      Q   Did Aron explain to you why he was moving away
19  from securitization audits?
20      A   He said that he was looking at the numbers, and
21  it didn't make sense.  And he was actively making new
22  loans through Power Choice Mortgage.  He is the president
23  of that company today; so I don't feel like I got a
24  complete explanation, just...
25      Q   Do you have -- beyond him telling you that it

Page 45

1   insurance license with the UBS, which lapsed after I left
2   their firm.
3   BY MR. VAUGHN:
4       Q   So currently today you don't hold any
5   professional licenses?
6       A   Nothing active.
7       Q   Have you ever had a professional license
8   revoked?
9       A   No.
10      Q   Or suspended?
11      A   No.
12      Q   And have you ever been the subject of any type
13  of a professional misconduct investigation?
14      A   I had to, as part of the E Universe lawsuit,
15  disclose to the CFA Institute of the litigation, and my
16  attorney John Case answered some questions to their
17  satisfaction.
18      Q   Beyond licenses, you hold a certification from
19  CFLA?
20      A   Yes.
21      Q   Do you hold any other types of certifications
22  that are related to your securitization audit work?
23      A   No.
24  BY MR. HOPKINS:
25      Q   And that certification from CFLA you received at

Page 46

1   the end of that three-day training you were discussing
2   earlier?
3       A   Yes.
4   BY MR. VAUGHN:
5       Q   And you don't have any legal training?
6       A   No.  No.  I have studied for the LSAT, I have
7   taken critical reasoning, undergraduate work.  But no,
8   nothing philosophy, ethics.  But no.  No formal legal
9   training.
10      Q   And we went through your education, but I will
11  just ask the point of question.  You are not a lawyer?
12      A   No.
13      Q   And you have never been a licensed attorney?
14      A   No.
15      Q   Have you ever, in connection with your work with
16  securitization audits, held yourself out to consumers or
17  the public as being an expert in the law?
18      A   No.
19      Q   Presently are you doing working for any
20  companies other than CFLA?
21      A   I do some tax returns for H&R Block as a tax
22  specialist.
23      Q   Anything else?
24      A   No.
25      Q   How long -- setting aside H&R Block, how long

Page 47

1   has it been that your work has been exclusively for CFLA?
2       A   I have worked exclusively for them since 2014.
3   BY MR. HOPKINS:
4       Q   I'm sorry.  I noticed you -- a look on your face
5   as if you were remembering something or reaching for
6   something in response to Mr. Vaughn's question about any
7   other companies that you are working for.  Was there
8   something else that you remembered?
9       A   Oh, no.  No.  I am applying for other work,
10  though, but no, nothing -- nothing else.
11  BY MR. VAUGHN:
12      Q   In what skills are you looking for work?
13      A   I was thinking of working for a credit union
14  that doesn't sell their loans.
15      Q   You mean that originates and holds their own
16  mortgages?
17      A   For the most part, Ginnie Mae, servicer.  But
18  other than that, may have some past participations but
19  nothing current.
20      Q   Other than H&R Block and CFLA, do you receive
21  any type of remuneration pay from any other sources today?
22      A   I have a Nissan pension.  I turned 59 and a half
23  March of last year; so I need to make ends meet.
24      Q   Are you okay to do a few more questions, and
25  then we do a break for a bit?

Page 48

1       A   Certainly.
2       Q   We have been talking about already this morning,
3   but in your own words, can you tell us, to your mind, what
4   is a securitization audit?
5       A   A securitization audit documents either evidence
6   or indications of fractionalization or other sales of a
7   loan, reported bank mergers and acquisitions, or any other
8   evidence that a loan might have been sold by review of
9   County title records, presentation of various supporting
10  Bloomberg or screens or other indications of loan sales,
11  along with a supporting affidavit of overall findings, and
12  an exhibit showing the County recordings.
13      Q   Anything else you would add to that?
14      A   I go through a -- when there are findings of
15  securitization, I will list out the various parties that
16  are involved by reviewing the prospectus and/or the
17  pooling and servicing agreement.
18          I will highlight certain sections of those SEC
19  governing documents explaining what those parties said
20  that they would do, and I will compare that to what
21  actually occurred in County records and note those
22  discrepancies.
23          Often I will find that assignments, also known
24  as a Transfer of Lien, are performed by assignees or
25  assignee agents posing as assignor officials, either using

Page 53

1  would imagine, in order to get a change of trustee, unless
2  it was something that the trustee told them that they were
3  going to do.  So they are kind of like the property owners
4  that just have some manager managing properties for them
5  out of state.
6      Q   Okay.  So your use of the term
7  "fractionalization" is different from your assignment
8  analysis where you characterize the note and the mortgage
9  from being split; is that right?
10     A   Yes.  That would be different from that aspect.
11 Fractionalization I think of as you take one piece of
12 paper and you -- not this piece of paper.  This piece of
13 paper, you just divide it up into a thousand pieces and
14 you start to sell little pieces of paper.
15     Q   Now, by your characterization of what happens to
16 a residential mortgage loan when it's deposited into a
17 security, it would be impossible to ever secure a loan
18 modification.  Has that been your experience?
19     A   No.  The whole idea is that it's -- it would
20 seem easier to be able to deal with one party, maybe a
21 community bank or a credit union that held the loans.  And
22 sure, banks have ten-to-one leverage ratio as a benchmark,
23 and they are not even using their own funds, but at least
24 you know who holds the loans, who you are dealing with.
25 And they might be able to make a loan modification because

Page 54

1  they just are a board of directors.
2      In the case of going to an Ocwen or a
3  NationStar, they may even purport to be the loan holder or
4  hey, we are the enforcing party because we hold the note,
5  and the homeowner is left in the dark not knowing that
6  it's in the Harbor View Mortgage Loan Trust 2005-13.
7      Q   Let's stick with my question.  I get that maybe
8  it would be easier, based on your characterization, if
9  there are fewer parties involved.  I understand that.
10     But what I'm asking is based on your experience
11 and the way you are characterizing fractionalization, it
12 would be impossible for a homeowner with a loan and a
13 security to secure a loan modification.  I was just asking
14 if that has been your experience, that it is not possible?
15     A   I think -- I don't hear a lot of what actually
16 happens at the end; so I don't know to what extent they
17 are getting modifications.
18     Q   Do you consider yourself an expert in the loan
19 modification process for residential mortgages?
20     A   No.
21     Q   And that would be true for whether or not a loan
22 was originated and held by one entity; correct?
23     A   Yes.
24     Q   Or whether or not a loan was originated and
25 deposited into a security, you are not an expert in the

Page 55

1  loan modification process for that?
2      A   No.  I don't have that empirical knowledge.
3      Q   Okay.  So the next thing you said in your
4  characterization of a securitization audit was evidence
5  that a loan might have been sold.  So is that what you
6  would characterize as a chain of title analysis, or is
7  that different?
8      A   That would -- well, first, it would be searching
9  through Bloomberg records to see definitive evidence of
10 securitization, and absent that there may be other
11 indications.
12     If Fannie Mae or Freddie Mac claimed ownership
13 of a loan, or there was a later assignment to them or a
14 deed transfer after foreclosure to one of those entities,
15 that would indicate past ownership of the note by Fannie
16 Mae or Freddie Mac.  Then those would be indications but
17 not definitive proof of securitization.
18     Fannie Mae, Freddie Mac, and Ginnie Mae do not
19 produce loan level detail of the loans that are placed
20 into those trusts.  You can look at their balance sheets
21 and see what percentage of loans are securitized on those
22 entities' balance sheets, ranging from 85 to 93 percent.
23     Ginnie Mae gets most of its money through Ginnie
24 Mae trusts.  It does not actually hold the loans.  But it
25 makes guarantees or gives insurance on FHA and VA loans.

Page 56

1      There may also be transfers to certain private
2  placement entities, mostly of which do not produce loan
3  level detail, but in some cases they do put the loan level
4  detail on the Bloomberg system.
5      So putting it altogether, you see if there is
6  any soft of likelihood that securitization may have
7  occurred.  In the case where we can see the loan level
8  detail match up the characteristics of the note and/or
9  mortgage or deed of trust to the Bloomberg record, then it
10 can be said with a pretty high degree of certainty that a
11 loan was securitized into a given trust.
12     Q   Let's go back to that in just a minute, but I
13 want to keep going down your list here, what you said was
14 a securitization audit.
15     So the next thing you said was an affidavit of
16 overall conclusions.  When I'm looking at a securitization
17 audit that you produced -- do you have the audit that's 35
18 pages and then the affidavit at the end that's two
19 pages? -- how am I supposed to read those together?
20     What is the controlling document?  What has the
21 authority?  Is one just background, like you testified let
22 me ask a different question.
23     You testified earlier that the affidavit doesn't
24 explicitly incorporate the report.
25     A   That's right.

Page 73

1  think, conditions of the holder in due course doctrine,
2  and the first was you actually had to pay for the loan.
3      Do you remember what the other conditions are?
4      A  No.
5      Q  And in the holder in due course doctrine, to
6  your mind, does that relate solely to this issue of a
7  signatory with a dual role, or is it assignments to
8  MERS --
9      A  It has to do with when a loan is actually
10  transferred.  When I worked in accounting outside of the
11  financial industry -- I have only worked at UBS Financial
12  Services which only had a peripheral role when it came to
13  commercial banking -- we would be able to determine how to
14  make accounting entries based on either cash trading hands
15  or when we expected that cash to trade hands.  We would
16  set up reserves or eventual cash receipts or cash
17  payments.
18      The role is cash is king.  That's what it boils
19  down to.  Over time, every asset tends to translate into
20  cash one way or another.  If you can't actually look at
21  the general ledgers, subsidiary ledgers, the account
22  analysis and see when did we actually buy this property,
23  when did this actually take place.  And in my review of
24  about, well, several thousand of these assignment
25  documents that just doesn't seem to be happening.

Page 74

1      Q  Do you have any expertise in laws around the
2  country as to whether or not the way you would do
3  accounting in your corporate life actually applies to
4  residential mortgages and assignments?
5      A  No.  I haven't worked in commercial banking,
6  per se.
7      Q  And do you consider yourself an expert in the
8  Florida statutory law?
9      A  No.
10      I will add one other thing too.  When I worked
11  at Nissan Motor Corporation, I understand from
12  conversations with Nissan Motor Acceptance Corporation,
13  which was a 5-billion-dollar organization at that time,
14  that they closed their books daily based on regulations.
15  They had to account for everything.  They knew where their
16  cash was at all times.
17      And it would not surprise me if banks know
18  exactly where all the loans are, whether they hold them on
19  their books or they're servicing those loans.  They would
20  know exactly what trusts.  Private placements would be
21  different, probably.
22      Q  Do you have an understanding -- strike that.
23      Do you have any expertise in the regulations
24  that apply to banks in recording assignments of
25  residential mortgages?

Page 75

1      A  No.  I see the fruit of it, though.
2      Q  Do you have any expertise in the regulations
3  governing banks and how they have to account for
4  residential mortgages that they hold on their books?
5      A  I review their financial statements.
6      Q  Anything beyond that?
7      A  No.
8      Q  How many securitization audits have you
9  performed, approximately?
10      A  Approximately 5000, I have produced, not where I
11  have personally prepared the audits from beginning to end.
12      Q  When you say "produced," how are you using that
13  word?
14      A  I have assistants who help me prepare audits,
15  putting in clerical information, putting in Bloomberg
16  screenprints, recording instrument numbers in the chain of
17  title summaries, putting in pooling and service agreement
18  extracts, those kind of things.
19      Q  So when you say "produced," do you mean the
20  final sign-off but maybe you weren't responsible for
21  putting ink to paper on every single part of it?
22      A  I have full edit control, and I do edit every
23  single audit that I see in some form or another, and I do
24  sign those reports.
25      Q  So I guess when you say that you produced 5000,

Page 76

1  you are responsible for 5000 audits even if you didn't
2  actually compile each individual component of it?
3      A  Yes.  That's correct.
4      Q  Are you compensated per audit by CFLA?
5      A  Yes.
6      Q  And has that compensation changed over time?
7      A  It has.
8      Q  What is it today?
9      A  It's $135.
10      Q  And what was it in 2012 when you started?
11      A  $125 with Bloomberg screenprints and $75
12  without.
13      Q  And what was it in 2014 when Mr. Lehman told you
14  he wanted you to be the exclusive auditor for CFLA?
15      A  He had bumped up the 125 rate to 135 briefly,
16  and then he -- and then I settled on 150.
17      Q  When did it go down from 150 to 135?
18      A  In about May of last year.  And he decided to
19  use Nkosi Gray for pulling Bloomberg screens.  I agreed to
20  pay $15.  Andrew said he would pay $35.  And he collects
21  $50 from -- I mean, he pays Nkosi $50, and so then he
22  collects $15, in effect, from me.
23      Q  And having Nkosi go to the public library to
24  pull up Bloomberg screenshots, is that in lieu of having a
25  direct subscription with Bloomberg to pull them up?

Page 77

1    A   Yes.  Right.
2    Q   When did that subscription end?
3    A   In May of 2017.
4    Q   Who held that subscription?  Was it you
5    personally or was it CFLA?
6    A   California State University, Long Beach.
7    Q   Explain that connection to me.
8    A   I have taken classes with Cal State Long Beach
9    for the past seven years.
10   Q   Classes in what?
11   A   Economics, philosophy, finance, literature --
12   Q   So --
13   A   -- engineering.
14   Q   Sorry.  I didn't mean to interrupt you.
15       In connection with those classes, you received a
16   login for Bloomberg?
17   A   Yes.
18   Q   Is that always how you've had access to
19   Bloomberg?
20   A   No.  I had access through Avid Law Center.
21   Q   Is it always how you've had access to Bloomberg
22   when you've been working with CFLA?
23   A   I had access through Avid, and I was working for
24   CFLA.  I had already had access through Cal State Long
25   Beach, and I decided to use their terminals instead of

Page 78

1    Avid Law Center which had exited that business and they
2    canceled their Bloomberg subscription.
3    Q   When you say "used their terminals," would you
4    physically go to Cal State Long Beach?
5    A   Yes.
6    BY MR. HOPKINS:
7    Q   Did CFLA ever have its own subscription to the
8    Bloomberg service?
9    A   I don't know.  But Andrew told me Bloomberg
10   would no longer do business with him because Andrew sued
11   Bloomberg successfully, and a term of that settlement was
12   that they would not do business with him.
13   Q   What was the business they were doing with him
14   before the lawsuit?
15   A   My understanding, which from review of past
16   class materials on the CFLA website, was that Bloomberg
17   users would get -- I'm sorry -- CFLA students would get a
18   trial Bloomberg subscription.  Andrew explained to me that
19   that deal did not go so well because Bloomberg wanted,
20   normally, a one- to two-year commitment.
21       People would try the business, exit out after
22   two or three months.  And Bloomberg was upset with Andrew.
23   But Andrew sued them because they weren't performing what
24   he thought were their obligations, and he won that case.
25

Page 79

1    BY MR. VAUGHN:
2    Q   When was that?
3    A   I had that conversation with him, I think, in
4    late 2012.
5    Q   Have you ever taken any formal training on the
6    Bloomberg terminal through Bloomberg?
7    A   The Bloomberg essentials training.
8    Q   What is that?
9    A   That's a very short series of modules:  Fixed
10   income, economics, equities, derivatives, that probably
11   any business student can complete in a few hours.
12   Q   When did you do that?
13   A   In 2012.
14   Q   Anything since then?
15   A   I went to some live Bloomberg training in
16   Los Angeles in 2012.
17   Q   Anything else?
18   A   No.  Just on the job.
19   Q   Does Bloomberg give out -- you have a
20   certification from CFLA.  Does Bloomberg give out
21   certifications to use their terminals?
22   A   They give subscriptions.  Every time I logged
23   in, they thanked me for being a subscriber since 2012.
24   Q   But other than subscriptions, they don't --
25   A   Right.

Page 80

1    Q   -- do the CFLA thing where they give out
2    certifications or something?
3    A   They have Bloomberg aptitude tests, which I
4    haven't taken.  People put on their resumes.
5    Q   Going back to your compensation per file, does
6    anything change your compensation?  Like if you do it on a
7    rush basis, does that --
8    A   At first, it didn't, but then I realized that
9    Andrew was receiving rush fees and talked to some other
10   people, and he agreed to pay an extra $15 for a rush job.
11   And my commitment to him was getting that done within a
12   24-hour period; otherwise, I wouldn't charge a rush fee.
13   Q   I know this can vary with all kinds of things,
14   I'm sure, but how long when you sit down to begin an audit
15   do you think it's going to take?
16   A   If I'm doing it personally, my goal is two and a
17   half hours.
18   Q   Okay.  And if you have others helping you
19   prepare it, does that increase the time or decrease the
20   time?
21   A   I think it increases the time based on the
22   turnaround and conversations that I've had where some
23   audits can take up to several hours.  The main component,
24   main variable is the number of assignments, because we
25   focus on the assignments.

Page 81

1    Q   The more assignments then, the longer it takes
2    to compile the audit?
3        A   Looking up the documents or looking at logical
4    and consistency such as here's party A to B and now
5    somehow party C to D, that C is assigned to party D, that
6    kind of thing.
7    BY MR. HOPKINS:
8        Q   Can I just ask a question about the rush file
9    fee?
10       You said you discovered that Andrew -- or you
11   heard that Andrew was charging a rush file fee to clients.
12   When was that that you learned that?
13       A   I think that was fairly early on.  Maybe 2013.
14   I had already signed the deal, but I thought it would be
15   worthwhile to renegotiate.  So I think that was in October
16   of 2013 that we finally settled on the $150 price which
17   included the $15 rush fee for those files.
18       Q   I see.
19       So $150 per audit was for a rush file?
20       A   No.  That was for just the standard service.
21       Q   That was just the standard?
22       A   Which usually the normal turnaround was three to
23   four days.
24       Q   Thank you.
25

Page 82

1    BY MR. VAUGHN:
2        Q   And I think you said signed on it.  Do you
3    actually have a contract with CFLA?
4        A   Yes, I have an independent contractor's
5    agreement.  I've never been employed, never held any
6    equity in the company.
7        Q   Can you estimate for me what your annual income
8    last year was from CFLA?
9        A   I have 1099s, and I have gotten my Schedule Cs.
10   I am responsible for certain expenses.  The assistants
11   with whom I would not be able to meet the demands of
12   Andrew.  The title records.  The notary scanning and
13   printing fees.  Mileage to the university and so on.
14       I normally would net in the 40,000s.  Last --
15   well, in 2007, I made approximately 30,000.  2018 is going
16   to be closer to 25,000.
17       Q   And how about gross?
18       A   Gross, there are times when I would bill 110- to
19   130,000.  In 2007, that dropped substantially to maybe
20   around 70,000.  I would expect in 2018, probably closer to
21   50,000.
22       Q   What do you think the highest net income you had
23   from CFLA was since 2012?
24       A   Approximately 50,000.  In terms of net?
25       Q   Yes.

Page 83

1    A   Yes.
2    Q   Have you ever been admitted into court as an
3    expert witness in connection with a securitization audit?
4    A   Not to my knowledge.  I mean, as far as like a
5    formal admission where I can always appear in a particular
6    court, no.  I am allowed to testify whether in deposition
7    or if a client makes a motion for me to appear as an
8    expert, then I have been allowed to testify.
9        Q   I guess what I was thinking of is the latter.
10       Have you ever appeared after a client filed a
11   motion to have you admitted as an expert and the court
12   granted the motion?
13       A   Yes.
14       Q   And what case was that?
15       A   I have a list of various cases where I have made
16   appearances.  Last year, I testified in Fort Walton Beach,
17   Florida.  I appeared twice in Phoenix, same court, same
18   judge.  I appeared in Reno, Nevada.  And Friday before
19   last, I appeared in Stamford, Connecticut.
20   BY MR. HOPKINS:
21       Q   You said you have a list of these matters?
22       A   Yes, I do.
23       And I appeared in Torrance, California at least
24   two years ago.
25   BY MR. VAUGHN:

Page 84

1    Q   And I don't mean to interrupt you, but I just
2    want to make sure we're on the same page.
3        These are cases where a court has qualified you
4    as an expert prior to your testimony?
5        A   I have no document saying I was qualified, but I
6    know that I was allowed to speak.
7        Q   And maybe --
8        A   Under oath.
9        Q   And maybe this is just a lawyer distinction
10   that --
11       A   Yeah.
12       Q   -- that I should flush out a little bit more.
13   But usually in state or federal courts, before a Court
14   will consider an expert opinion, there is usually a
15   process in which one side tries to get someone qualified
16   as an expert.  The other side might present arguments to
17   the Court as to why they are not an expert.  And then the
18   Court will make a determination as to whether or not the
19   individual is actually an expert in whatever field they
20   are purporting to be an expert in.
21       A   I'll give you an example.
22       I went to Freehold, New Jersey, 2016, and I was
23   the admitted expert, except the Court said that they had
24   not been given proper notice, but they allowed the
25   last-minute bank replacement to act as their expert

Page 85

1  instead, and he spoke.
2      Q  Instead of you?
3      A  Yes.  That's how she explained it.
4      Q  But you weren't allowed to speak?
5      A  Right.
6      Q  So that would be an example in a case where you
7  were not admitted as an expert?
8      A  Because of -- yeah -- the late notice.
9      Q  And for whatever reason.
10        And what I'm trying to get at is instances in
11  which you have appeared and testified.  And then different
12  from that are instances, if any, in which a Court
13  considered motions from the parties and a Court actually
14  ruled that you were an expert in securitization audits?
15     A  I'm not aware of where I've actually been ruled
16  as an expert.  The normal occurrences when I am placed on
17  a list or when I have appeared in court, either the client
18  has made a motion or they would like to just add me on the
19  spot.  When it's an attorney who is managing the process,
20  I usually get to speak.  If it's a pro se client, often I
21  won't be able to.
22     Q  Why is that?
23     A  Probably because the client does not understand
24  the Rules of Civil Procedure or they are just too late or
25  too early in the process or they think that they can just

Page 86

1  bring someone, even though that is not the particular
2  stage of the case.
3      Q  What do you think your breakdown is in terms of
4  your court appearances as to whether or not you're
5  appearing with a lawyer on behalf of a homeowner or
6  appearing with the homeowner proceeding pro se?
7      A  I'd just estimate about 50/50.
8      Q  Okay.  Those court appearances in connection
9  with your audits, do you work directly with a lawyer or
10  the pro se homeowner to schedule those, or does Andrew
11  Lehman coordinate that?  Can you go through the process
12  with me as to how you know that it's time for you to go to
13  court?
14     A  Andrew notifies me that I have been retained as
15  an expert.  He will usually give instructions to the
16  client to make my travel arrangements, and he will charge
17  some sort of fee.  If it's same-day travel, they'll charge
18  up to four hours.  If it's overnight travel, up to eight
19  hours.
20        And then I am allowed to be able to communicate
21  directly with the client, change phone numbers.  I will
22  usually have some kind of phone call, or if I fly in, meet
23  with the client, talk about the case.
24     Q  What do you mean then you will be allowed to
25  talk to the client?

Page 87

1      A  Well, normally I don't speak with clients
2  directly except through email, and the emails that I send
3  are made through Andrew, or in the past, through his
4  staff.
5      Q  Why is that?
6      A  It's the policy that Andrew set up.  Probably
7  did not want me to be inundated with a bunch of requests
8  or not to be in the loop as far as what was going on.  But
9  I do copy him on almost ever material communication with
10  the client or give him a breakdown of what happened in a
11  phone call for his information, what issues were
12  discussed.
13     Q  How many times have you actually testified in
14  open court?
15     A  Maybe half a dozen.
16     Q  And if -- we can refresh your recollection, if
17  you need to, but we read a deposition transcript of yours
18  that you gave in 2015, and at that time you testified that
19  you had not testified in open court?
20     A  Because at that time I had probably only
21  participated in depositions.
22     Q  I just wanted to --
23     A  Yeah.  It has been more recent that I have been
24  allowed to be in court.
25     Q  Okay.  And by "allowed to be in court," because

Page 88

1  the Court's allowed you to or because Mr. Lehman let you?
2      A  I would imagine both would be necessary
3  conditions.
4      Q  Okay.  And those six times, was it always with a
5  lawyer, or was it sometimes a pro se litigant?
6      A  It was either.
7      Q  Okay.  And do you recall the jurisdictions?
8      A  The ones that I already named.
9      Q  For Long Beach, Phoenix, Reno, Stamford?
10     A  Stamford; right.  Torrance, California.
11     Q  Any others?
12     A  Chicago, I appeared on a screen, is what they
13  told me, as I sat home working.  And the judge wanted to
14  listen to the appraiser and did not want me to be heard
15  from, even though my face, they told me, was on the TV
16  screen in the court.  So I just listened to the
17  proceedings via phone.
18     Q  But nothing else?
19     A  The New Jersey, right, I wasn't allowed to
20  testify.  No, no.  It's mainly been depositions.
21     Q  And how many depositions do you think you have
22  sat for?
23     A  About 12.
24     Q  Do you have any idea how many times one of your
25  securitization audits has actually been filed in court?

Page 89

1    A   No.
2    Q   Not something you track?
3    A   No.
4    Q   Do you have any idea if CFLA tracks it?
5    A   I don't know.
6    Q   Have you ever had discussions with Mr. Lehman
7    about a case in which there was an adverse ruling after
8    you testified either in court or in deposition and adverse
9    to the homeowner?
10   A   I haven't had discussions with him.
11   Q   Have you ever discussed the outcome of a case in
12   which you have offered testimony?
13   A   I had to answer questions about a
14   Bario Nuevo (phonetic) case from time to time.
15   Q   Was that the ARDC case?
16   A   ARDC?
17   Q   The Illinois State Bar case?
18   A   No, no.  I corrected some information to report
19   during the deposition, and it was prominently reported
20   that the homeowner lost that case.
21   Q   You corrected some information during the
22   deposition?
23   A   Right.  I said -- to my chagrin, I saw in the
24   report that I said that the loan was placed into a certain
25   Fanny Mae trust when what I meant was it may have been

Page 90

1    placed into a certain trust.  And they since then
2    corrected that error from occurring in the future.
3    Q   Is it your understanding that the homeowner lost
4    that case because of that issue?
5    A   I don't know.
6    Q   Okay.  Do you know the outcomes of the cases in
7    which you provided testimony?
8    A   I usually don't hear.  Now and then, I will
9    receive a call.  Someone will thank me for an audit or say
10   that they received more time.  Or Herb Penrose in Reno
11   called me to say that foreclosure would not be able to
12   proceed, but I haven't been able to corroborate that
13   information.  Haven't looked at the judgment.
14   Q   Do you know what Westlaw is?
15   A   Yes.
16   Q   Have you ever researched the outcomes of any of
17   the cases that you testified in on Westlaw?
18   A   No.  I have just looked at some of their search
19   capability.
20   Q   Have you ever researched how courts have
21   reviewed the securitization audits that have been filed by
22   homeowners or their lawyers?
23   A   No.
24   Q   Why isn't that something that would be important
25   to you in preparing securitization audits, how courts are

Page 91

1    treating them?
2    A   I do care about what happens.  But as I say to
3    people that I discuss this with, it's always an uphill
4    battle.  And I'm aware of very few cases where loans have
5    been removed.  I'm aware of the Abinus (phonetic) case in
6    Massachusetts that Marie MacDonald worked on.
7        I believe it is important, but I also believe
8    that uncovering the truth is important as well.
9    Q   But wouldn't an understanding of how courts are
10   treating your securitization audits help you prepare
11   better securitization audits?
12   A   I wish I had time to do that much more
13   thorough research.  The demands are such that I have just
14   kept producing the reports.
15   Q   So it's something that you wish you had
16   considered?
17   A   I wish I could have.  I see in the limited
18   circumstances I've observed that usually the judge wants
19   to get the money to the investors of the trust or whatever
20   the case may be.  So I just have just kept, I believe,
21   fighting an uphill battle.
22   Q   Is the only impediment to your researching the
23   outcomes of the cases in which your report has been filed
24   just the fact that you have too many reports to prepare
25   and not enough time in the day?

Page 92

1    A   It seems that I just overall don't make that
2    much to where I could set aside a huge amount of time,
3    which I would like to do.  I believe I have the capability
4    to do.  But then again, I am not an attorney, and I do
5    rely on Andrew Lehman.
6    Q   You rely on Andrew Lehman for that kind of
7    analysis, how courts are looking at these things?
8    A   Yeah.  See if we're doing that or if he were
9    getting attorneys involved.
10   Q   Have you actually had conversations with Andrew
11   about how courts are treating securitization audits?
12   A   I have.  And he said that we do not get a lot of
13   information on the actual outcomes.
14   BY MR. HOPKINS:
15   Q   So other than researching how courts might treat
16   them, which we've asked about, have you done any other --
17   made any other efforts to determine how, let's say, useful
18   the audits are for those who buy them?
19   A   I did that one selective sample study to just
20   show how much extra time a homeowner might stay in the
21   home, which could be a contributing factor along with the
22   lawsuit.
23       When I had conversations with Aron Rofer, he
24   told me that in three years that he had gotten 700 loan
25   modifications by working directly with the banks instead

## Page 105

1  New Jersey, do you know which state law would apply?

2      A   I could start reviewing the codes, but no, I

3  haven't had any real experience doing that.

4      Q   But you wouldn't know whether or not New York

5  law applied or New Jersey law applied?

6      A   If a property is in New Jersey, I mean,

7  certainly New Jersey forecloser law would apply to New

8  Jersey residents.  The same for a New York residence where

9  New York law would apply, I would think.  I can't see any

10  other logical conclusion.

11      Q   What if the mortgage provided for a different

12  choice of law?

13      A   In that case --

14      Q   Why don't we strike that.

15      A   I don't systematically review, but in every case

16  where I have happened to have come across it, it --

17  usually local law is applied.  But no, I haven't actually

18  thought to do that.

19      Q   And so you have no expertise in determining --

20      A   No.

21      Q   Let me just finish.

22          You have no expertise in determining what law

23  applies during a foreclosure action?

24      A   No.

25      Q   Okay.  In performing a securitization audit, do

## Page 106

1  you need to review the pooling and service agreement or

2  the trust agreement?

3      A   I do.

4      Q   So what do you do with a GSE securitization

5  where you don't have the pooling and servicing agreement

6  or trust agreement to review?

7      A   I usually just pull in some summary documents.

8  And I have said in reports that pooling and service

9  agreement is not required because of the indirect

10  guarantee that the federal government gave to those

11  government-sponsored entities, Fannie Mae and Freddie Mac,

12  which was realized in 2008 when those entities failed and

13  went into federal conservatorship.

14      Q   Do you have an understanding as to what the

15  composition of MBS and the marketplace is today, whether

16  it's private label securities predominantly or GSE-backed

17  securities predominantly?

18      A   GSE predominantly.

19      Q   Do you know what the trend for private label

20  securities has been in the market since 2008?

21      A   It dropped precipitously in 2008.  It started to

22  make a comeback in 2010.  Started to pick up a little bit

23  in 2012.  Fannie Mae and Freddie Mac have sold -- in press

24  reports, they have sold billions to certain private label

25  trusts.

## Page 107

1      I can see empirically what is going on with

2  particular trusts, the Carrington Trust, Bayview, several

3  other -- there is a few that are private label trusts, but

4  based on the volume, it's almost all Fannie and Freddie

5  and Ginnie now.

6      Q   And it's impossible for you to tell to a degree

7  of certainty that a specific loan is in a specific GSE

8  securitization; correct?

9      A   That's correct.

10      Q   So what is your methodology -- strike that.

11          Many of your audits have a conclusion that a

12  loan may have been securitized into a GSE trust.

13          What is your methodology for reaching a

14  conclusion that a loan may have been securitized in a GSE

15  trust?

16      A   I have reviewed the financial statements of

17  Fannie Mae and Freddie Mac to see what percentage of loans

18  are actually securitized.

19          In terms of a specific trust, I will review the

20  trust formed shortly after loan origination to look at the

21  vintages of the loans placed into trusts and the

22  geographical regions for those trusts.  But no, I don't

23  have the loan-level detail; so I am not able to say

24  definitively that a loan is placed into a particular

25  trust.

## Page 108

1      When I review the Fannie Mae and Freddie Mac

2  summaries, they're not even specifying those in the

3  investor documents, although information is on Bloomberg.

4  So I conclude that the issue is really securitization as

5  opposed to any particular trust.

6      Q   Got it.

7          So the issue is just whether or not a loan has

8  been securitized; it doesn't really matter whether it's --

9  in which trust it has been securitized?

10      A   And --

11      Q   That's just yes or no.

12      A   Yes.  As far as that, yes, that's right.

13      Q   Okay.  And then your determination for whether

14  or not a loan may have been securitized is just the

15  general conclusion that most residential mortgage loans

16  are in fact securitized?

17      A   Based on balance sheet review.

18      Q   Okay.

19          MR. VAUGHN:  Why don't we go off the record for

20  a minute.

21          (A recess was taken from 11:57 a.m.

22          to 12:07 p.m.)

23  BY MR. VAUGHN:

24      Q   Back on the record.  Let's mark Exhibit 2.

25          (Exhibit No. 2 was marked for identification

Page 109

1    and is attached hereto.)
2    BY MR. VAUGHN:
3        Q   Mr. Carrigan, I've had the court reporter mark
4    as Exhibit 2 a securitization audit that I will represent
5    was produced to us by CFLA in response to our 2017 CID.
6        A   Okay.
7        Q   This securitization audit was prepared for
8    Lawrence L. Berardi --
9        A   Uh-huh.
10       Q   -- and it's dated February 10th, 2017.
11       A   Uh-huh.
12       Q   You prepared many, but I'll ask anyway.  Do you
13   recall this particular audit?
14       A   I don't offhand.
15       Q   It's not surprising.
16       A   It looks very similar to other Fannie type of
17   audits I've produced.
18       Q   So before we dive into the substance of this
19   audit, what is the process for how you find out that it's
20   time for you to prepare an audit?
21       A   I receive a request from Andrew Lehman or his
22   staff with a person who wants an audit performed along
23   with their property address.  In some cases, I need the
24   last four digits of the social security number.  In some
25   cases, I need the full social security number.  The --

Page 110

1    what is known as the MERS investor search requires the
2    full social security number.  Fannie and Freddie searches
3    require the last four digits of the SSN.
4        I will pull the title records for that
5    particular address and draw certain conclusions regarding
6    who seems to be the likely owner of that loan.
7        Q   And you have over the years had different people
8    assisting you in preparing these audits; correct?
9        A   Assisting me with the clerical input but never
10   as part of determining who I believe is the actual
11   indicated owner of a loan.
12       Q   And do you have additional people helping you so
13   that you can prepare more audits?
14       A   That is right.  So that I -- well, I literally
15   don't have enough time to produce all these 40- to 60-page
16   reports, three on average a day for the last seven years.
17       Q   And over the years, when you mentioned that
18   Mr. Lehman has suggested different people to help you, has
19   that been with the idea that then you would be able to
20   produce more audits?
21       Let me ask a different question.
22       Has Mr. Lehman suggested different people to you
23   as independent contractors so that you could work more
24   efficiently?
25       A   No.  He explained that they needed work.  And

Page 111

1    certainly it would help for me to be able to produce more,
2    but he didn't state that explicitly, like just wanted you
3    to talk to this person, and like so and so got done with
4    their back problems and they want to get back into this,
5    for instance.
6        Q   Do you have any understanding as to how CFLA
7    markets your audits?
8        A   I have seen the information on the website, but
9    I haven't really focused on that.  I see that they produce
10   a newsletter weekly.  I met one of the attorneys here in
11   Los Angeles at a seminar Patricia Rodriguez spoke at, and
12   she told me that she did a lot of the editing for the
13   weekly newsletter.  Just can't remember her name now.
14       So I suppose Andrew relies on a number of
15   sources, but I really don't get involved in the marketing
16   or sales.
17       Q   Have you reviewed the website in sufficient
18   detail to have noticed whether or not anything on the
19   website is true or untrue with respect to your
20   securitization audits?
21       A   I just don't get involved in that aspect.
22       Q   And the same with how Mr. Lehman advertises your
23   securitization audits, do you have a sufficient
24   understanding as to CFLA's advertising practices to know
25   if the representations the company makes about your audits

Page 112

1    are true or untrue?
2        A   No.
3        Q   Would you ever claim that your audits are a
4    hundred percent accurate?
5        A   No.
6        Q   So what I would like to try to do -- and if this
7    becomes cumbersome, maybe we can find a different way to
8    do it.  But before we actually talk about the substance of
9    the audit, if you can flip through it, and you can flag
10   for us what is kind of template that you get from CFLA and
11   what is your work product?
12       A   Would it be acceptable for me to expand on my
13   last answer and direct you to the disclaimer?
14       Q   We're actually going to talk about the
15   disclaimer in a minute.
16       A   Oh, okay.
17       Q   And your answer, I think, is a hundred percent
18   accurate, at least as far as I am concerned.
19       A   Okay.  All right.  Okay.
20       Q   But we'll talk about the disclaimer in a minute.
21       A   Okay.
22   BY MR. HOPKINS:
23       Q   Can I ask just one very quick clarifying
24   question.
25       Throughout this today so far, we have been

Page 121

1   A   That's template language.
2   Q   That is also template language?  Okay.
3   BY MR. VAUGHN:
4   Q   Okay.  And then pages 20, 21, 22, 23, and 24 are
5   all Bloomberg screenshots?
6   A   Those are Bloomberg screenshots.
7   Q   That you would add specific to each audit?
8   A   Right.  Based on my expertise at accessing
9   Bloomberg's screens, I would know how to annotate, and I
10  followed a certain form template for what screens to pull
11  down.
12  Q   Okay.  So the template for what screens to pull
13  down from Bloomberg, did that come from CFLA or from you?
14  A   That came from CFLA.  And prior to that, from
15  Avid, which had reports similar to CFLA reports in terms
16  of the Bloomberg screens pulled.
17  Q   Got it.
18      And what's the name of the individual that goes
19  to the public library now?
20  A   Nkosi Gray.
21  Q   Nkosi Gray.
22  A   N-k-o-s-i.
23  Q   And so do you instruct Nkosi which screens to
24  pull?
25  A   I do.  I give them the initials of the screens.

Page 122

1   Q   Got it.
2   A   The description screen is DES, for example.
3   Q   Okay.  And then page 25 is the Fannie Mae loan
4   lookup.  Is this Mr. Carrigan?
5   A   It's the Fannie Mae website with the variable
6   information, and it's -- it was on the template which I
7   used, and it would make sense to show if Fannie Mae
8   claimed ownership of that loan to place that in there.
9       I received the template with Fannie Mae loan
10  lookup.  Does Fannie Mae own my loan?  Yes, based on
11  research document below.  Who is Fannie Mae, et cetera.
12  So I've added the "match found" or "no match found" along
13  with "Fannie Mae search results" and -- well, I have a
14  mistake here.  It says "no acquisition claimed."  But it
15  is that Fannie Mae is saying that they own the loan.
16  So...
17  Q   So everything underneath the last line that ends
18  "that lend money to homebuyers" is what you drop in?
19  A   Everything below that, yes.
20  Q   Okay.  And then page 26?
21  A   That's CFLA template.
22  Q   Okay.  Then page 27, securitizing a loan?
23  A   CFLA.
24  Q   Okay.  And does that go all the way through page
25  29, all CFLA?

Page 123

1   A   Yes.  On instruction of Andrew, I had taken this
2   securitization summary which used to be part of the
3   affidavit and I -- he instructed me to place it elsewhere
4   in the report which I did immediately prior to the
5   affidavit.
6   Q   Okay.  And that's the securitization summary
7   heading beginning on page 28, and that goes over onto pay
8   29.  That summary used to be in the affidavits --
9   A   Yes.
10  Q   -- and on Mr. Lehman's instructions, it's now in
11  the report?
12  A   Yes.
13  Q   Okay.  And all of that, pages 27, 28, and 29,
14  all comes from CFLA?
15  A   Yes.
16  Q   Okay.
17  BY MR. HOPKINS:
18  Q   Other than moving the location where some of
19  this information appears, have you made any other changes
20  to the language here?
21  A   I did some additional research when a client was
22  asking me about the source of the information where a loan
23  may be sold up to 30 times per federal reserve
24  regulations.  I realized that there was plenty of
25  information on the internet, but there was no actual

Page 124

1   source for it.  So I took that off the report.
2   BY MR. VAUGHN:
3   Q   Do you remember when that was?
4   A   I think around -- it could have been around
5   2016.
6   BY MR. HOPKINS:
7   Q   But otherwise, you haven't adjusted the content
8   of this --
9   A   No.
10  Q   -- section that we've just been discussing?
11  A   Of those particular sections, no.
12  BY MR. VAUGHN:
13  Q   So we are up to the affidavit, and before we
14  look at that, have you -- other than this one example in
15  maybe 2016, have you taken any independent analysis of all
16  of the different template sections that we just looked at
17  to assess them for accuracy?
18  A   Not of the form itself.
19  Q   Well, let's look at specifically the section
20  beginning on page 27, securitizing a loan.  It ends on
21  page 29.
22      Have you done any independent research to
23  determine whether or not the conclusions on those pages
24  and the analysis on those pages is accurate?
25  A   I have general familiarity.  Lenders certainly

Page 125

```
 1   do sometimes have other lenders under them, and they
 2   provide them warehouse lines of credit.  But no, I have
 3   not definitively reviewed all of the document for
 4   accuracy.
 5        Q   Okay.  And that's true of the more limited
 6   section that's just the Securitization Summary that begins
 7   on page 28 and goes over to page 29, you haven't
 8   independently reviewed the conclusions and analyses in
 9   there to assess their accuracy?
10        A   I've reviewed them, but no, I certainly haven't
11   performed any legal analysis.  The conclusions made sense
12   to me.  I looked into what it means for a note to be
13   converted into a stock or how could that take place at the
14   same time.  I have answered certain client questions about
15   that.
16            And the points is that once a note is
17   securitized, it loses its original characteristics such
18   that it's grouped with other notes, and it is normally not
19   going to be pulled out in the case of a residential MBS
20   trust.
21            In the case of a commercial trust, I understand
22   from conversations with REDC that sometimes auction
23   properties are pulled out of trusts.  So typically, once
24   an RMBS gets into a trust, then it's sold as a group with
25   other loans, if it ever is sold itself, although
```

Page 126

```
 1   individual loans can be modified.
 2            So I have had some client conversations via
 3   email regarding conversion of a note into a stock and how
 4   that empirically seems like an irrevocable act.
 5        Q   So this paragraph is in almost every one of your
 6   audits; is that accurate?
 7        A   Yes.
 8        Q   Okay.  And it concludes at the end that it's a
 9   form of double-dipping and double-dipping is a form of
10   securities fraud?
11        A   If it were to be in existence at the same time.
12            Now, since then, we've removed all of that
13   language from the reports.  Andrew instructed me to just
14   take all of that out.
15        Q   Everything after Securitization Summary?
16        A   Everything in Securitization Summary before the
17   disclaimer.
18        Q   Okay.  And what was the date of that again?
19        A   I think that was sometime in 2016.
20        Q   If you want to look at the first page of these
21   audits?
22        A   Oh, maybe it was in 2017, then.  Yeah.  Or
23   sometime after that.
24        Q   Okay.  But you don't specifically remember?
25        A   I don't.  I would have to look it up.
```

Page 127

```
 1        Q   Could it have been last year and not in 2017?
 2        A   I can't definitively say without looking.
 3        Q   Okay.
 4        A   Seems like it was at least a year ago.
 5        Q   So your affidavit which is on page 30 of 31,
 6   what of this is you and what of this is template from
 7   CFLA?
 8        A   I put in my own experience in paragraph 2.
 9   Everything else on the first page is from CFLA.
10   Everything else is from CFLA.
11        Q   Okay.  So paragraph 2 is you, everything else is
12   them?
13        A   Yes.
14            MR. VAUGHN:  Okay.  Let's mark as -- let's mark
15   as Exhibit 3.
16            (Exhibit No. 3 was marked for identification
17             and is attached hereto.)
18   BY MR. VAUGHN:
19        Q   I just had the court reporter mark as Exhibit 3
20   a signed and notarized copy of the affidavit that we just
21   looked at.  Do you want to take a look at that quickly and
22   make sure you agree it's the audit that accompanies that
23   report -- or, excuse me -- the affidavit that accompanies
24   that report?
25        A   Sure looks like it.
```

Page 128

```
 1        Q   Okay.  So let's walk through this line by line.
 2   And I just want to understand what's in it and --
 3        A   Okay.
 4        Q   -- and your understanding of it.
 5            So the first is your attestation that you are
 6   providing the affidavit under penalty of perjury; correct?
 7        A   Yes.
 8        Q   Okay.  So first few lines, that you are a
 9   subscriber of the Bloomberg Professional Service.
10            Do you see that?
11        A   Yes.
12        Q   Okay.  Are you personally a subscriber of the
13   Bloomberg Professional Service?
14        A   Not currently.
15        Q   Okay.  Have you ever been?
16        A   Yes.
17        Q   And when was that?
18        A   Personally?
19        Q   Yes.
20        A   From 2012, first through Avid Law Center, and
21   after that time through Cal State Long Beach where they
22   welcomed me individually as a subscriber up until May of
23   2018.
24        Q   Okay.  So you review subscription through Cal
25   State Long Beach as being your personal subscription?
```

Page 137

1    Q   Okay.  So that would be something that would be
2    easy for you to provide to us?
3    A   Sure.  Yeah.
4        MR. VAUGHN:  Okay.  Why don't we do this.  Why
5    don't we go off the record and take a break for lunch.
6        How much time do you two think you need for
7    lunch?
8        Let's go off the record.
9        (A recess was taken from 12:45 p.m.
10       to 1:30 p.m.)
11   BY MR. VAUGHN:
12   Q   Back on the record.
13       Mr. Carrigan, welcome back.
14   A   Thank you.
15   Q   So let's look at Exhibit 2 which is the Berardi
16   audit that we went through -- or started to get through
17   before lunch.
18   A   Okay.
19   Q   And now what I would like to do is walk through
20   the -- some of the substance of the audit.
21   A   Okay.
22   Q   Hang on a second.
23       Okay.  Let's begin with page 25 of the audit,
24   which is where you conclude that -- sorry, strike that.
25       Let's begin with page 9 of the audit.  And this

Page 138

1    is the report summary, and I'm looking at the heading that
2    says "Securitization" and then in parentheses "The Note."
3        And you conclude here that the note may have
4    been securitized into the Fannie Mae Guaranteed REMIC
5    Pass-through Trust."
6        Do you see that?
7    A   Yes.
8    Q   Okay.  Can you tell me how you concluded that
9    Mr. Berardi's loan may have been securitized into this
10   trust?
11   A   In my review of Fannie Mae claimed loans, I see
12   that Fannie Mae creates trusts repeatedly and that they
13   show certain characteristics in Bloomberg regarding the
14   number of loans placed into those trusts, the amount of
15   loans that are shown on their balance sheet, the amount of
16   loans that are securitized and that securitization
17   certainly could have occurred.  It could have occurred in
18   this particular trust, but I don't have definitive
19   loan-level detail.
20   Q   And what is your basis for concluding that it
21   could have been securitized in this specific trust, beyond
22   just the fact that Fannie securitizes most of the loans
23   that it owns?
24   A   And that loans formed after a particular loan
25   origination date are -- could only be securitized after

Page 139

1    that date, that these are closed-in trusts or new
2    collateral is not placed into the trusts.
3        Q   Turn to page 6 with me.  And this is the -- a
4    screenshot of the first page of the prospective supplement
5    for this REMIC trust; correct?
6        A   Uh-huh.  Yes.
7        Q   Do you see that heading where it says, "The
8    trust and its assets," in the bottom left-hand corner?
9        A   I'm looking.
10       Q   You are on the right side there, right there by
11   your finger, "The trust and its assets"?
12       A   Yes, yes.
13       Q   Can you read there that it says, "The trust will
14   own Fannie Mae MBS"?
15       A   Yes.
16       Q   Okay.  So this trust owns other Fannie Mae MBS;
17   correct?
18       A   That's what it says.  Yes.
19       Q   It doesn't own individual mortgage loans; right?
20       A   I suppose not.  But it says, "Also the mortgage
21   loans underlying the Fannie Mae MBS are first lien
22   single-family fixed rate loans."
23       Q   Reading this, is it still your conclusion that
24   the Berardi's loan could be in this trust?
25       A   I suppose I just don't have enough information

Page 140

1    in that case.
2        Q   The trust owns the certificates of other
3    mortgage-backed securities; right?  That's what it says
4    here?
5        A   That's what it says.
6        Q   Those other mortgage-backed securities, the
7    trust for those might own loans; right?  But not this
8    trust.  This trust doesn't own loans.
9        A   I suppose so.
10       Q   I will represent to you, Mr. Carrigan, that you
11   conclude that individual mortgage loans could be in trusts
12   that own Fannie Mae MBS with some regularity, which makes
13   me just want to ask again, do you really look at the
14   trusts to determine what they own when concluding whether
15   a loan might be in the trust?
16       A   I look at the Bloomberg detail, and I see a
17   geographic distribution for various states and pools.  So
18   I suppose a pool could be one of those MBS trusts to which
19   you are referring.  I see servicers.  And somehow
20   underlying loans make up those certificates.  But right, I
21   didn't -- that didn't occur to me.
22       Q   You testified earlier that what is really
23   important to you is that the loan might have been
24   securitized, not what trust it's in; is that correct?
25       A   Yes; right.

Page 141

1  Q  Given the fact that the first page of the
2  ProSupp here says that this particular trust owns other
3  MBS, not individual mortgage loans, is it fair to say that
4  you really don't do much of an in-depth analysis of a
5  particular trust when you are determining whether or not a
6  loan could be in it?
7  A  Suppose I can't do that without the loan-level
8  detail.
9  Q  So really what you do with the GSE MBS is you
10  just look for one that closed after the loan was
11  originated; right?
12  A  In almost every case, and very few cases do I
13  have a MERS milestone report that indicates a particular
14  Fannie Mae trust, and then I can drill down on those
15  trusts further, but those also don't have loan-level
16  detail.
17  Q  But setting aside those instances where you
18  might have extra MERS information, all you really look for
19  is just a security that closed after the loan was
20  originated; right?
21  A  And in which the servicer is represented as a
22  top servicer and where there is significant collateral for
23  that particular state and where the vintages of the loans
24  line up with the collateral overview.
25  Q  Okay.  And for every single securitization

Page 142

1  audit, you really do look at those other characteristics
2  other than just the issue date for the security?
3  A  When I was pulling the Bloomberg screens myself,
4  yes, I would look and look for what I thought might be the
5  most applicable trust for a given loan.
6  Q  Can you point me to on the Bloomberg screenshots
7  that you have included in this report the information that
8  gives you comfort beyond the issue date that this loan
9  could have been in the security?
10  A  Ditech is listed as the servicer.  And on page
11  24, the collateral composition shows that the top servicer
12  is Ditech.  So that would formerly be Green Tree, and they
13  took over substantial portion of loans from B of A,
14  formerly Countrywide Loans.  It also owns property based
15  in New York and...
16  BY MR. HOPKINS:
17  Q  I'm sorry.  What page was that?
18  A  Page 24.  I don't have a collateral overview
19  screen for this particular report.  But I would also look
20  at the vintage of the loans.  So I would look for a trust
21  with mainly 2007 loans.  I wish I had more detailed
22  information.
23  BY MR. VAUGHN:
24  Q  Would you still conclude sitting here today that
25  this -- the Berardis' loan may be in this trust?

Page 143

1  A  Fannie owns some of those MBS that has the
2  individual loan.  And yes, this trust could be an indirect
3  owner of that loan.
4  Q  And that's the way you characterize it if it's
5  indirect owner of the loan?
6  A  I did not because we're just talking about it
7  now.
8  Q  But if you were to revise this report, you would
9  conclude that this trust may be an indirect owner of the
10  loan?
11  A  Yes, yes.
12  Q  Would you make that correction with respect to
13  any report where you reached a conclusion about possible
14  ownership where the ProSupp indicates that the trust will
15  own Fannie Mae MBS?
16  A  Yes, I could make that correcting statement.
17  Q  Is there anything in this report that informs a
18  homeowner that what is important is not what trust the
19  loan is in but just that the loan has been securitized?
20  A  It shows an example of the type of
21  securitization work that Fannie Mae performs and may be in
22  that or a similar trust.
23  Q  But, I mean, you got pages here of trust
24  analysis, the ProSupps, the report summary on the trust
25  that it might be in.

Page 144

1  Really, though, what you have told us today is
2  that none of that matters, what just matters is that the
3  loan might have been securitized; right?
4  A  That, along with there may be a chain of title
5  discrepancies, yes.
6  Q  Right.  But with respect to the analysis of what
7  security the loan might be in, isn't that really irrelevant
8  to your opinion?
9  A  I wish that Fannie were more forthcoming with
10  their loan-level detail, but they're not.
11  Q  Right.  But just "yes" or "no" or "I don't
12  know."  But isn't it irrelevant to your opinion what trust
13  the loan's in?
14  A  No.  I think it's relevant to show what type of
15  trust.  Most of these trusts that I pull are very similar
16  in the types of -- the way that the loans are grouped into
17  those trusts.  You -- they're obviously different,
18  different amount of capital is raised.  They're different
19  states or servicers involved.
20  But as far as the process of removing the
21  borrower from ultimately the -- those people that provide
22  the funds, it's far removed.  Fannie Mae is sitting in the
23  middle providing guaranties to those investors which is
24  why they keep those loans on their balance sheet.
25  Nevertheless, the money is not coming from

Page 145

1   Fannie Mae in most cases.  So I think in general, it is
2   relevant.
3       Q   Okay.  What about an individual trust is
4   relevant to your opinion in this report?
5       A   It shows an example of the type of
6   securitization work that Fannie does.
7       Q   So just as an exemplar?
8       A   Yes.
9       Q   Shouldn't your report then say, my analysis
10  of the Fannie Mae REMIC trust 2007-37 is just by way of an
11  example?
12      A   Yes.  And when pressed by a client, I do answer
13  that question and say that this may be one of many trusts
14  into which a loan may have -- the loan may have been
15  securitized, or it may be held in the corporate capacity.
16  And in the header to every email, I say identification of
17  the exact Fannie Mae or Freddie Mac or Ginnie Mae
18  securitized trust or corporate portfolio.  Those
19  instructions are given in the Bloomberg section of the
20  report.
21  BY MR. HOPKINS:
22      Q   Have clients pressed you on this in the past?
23      A   Occasionally.
24      Q   How often would you say?
25      A   Not very often.

Page 146

1       Q   Less than ten times?
2       A   Somewhere around there, yes.  A handful, maybe,
3   relatively.
4   BY MR. VAUGHN:
5       Q   Do you think a pro se homeowner representing
6   themselves in foreclosure understands that this analysis
7   of this particular trust is just by way of an example, or
8   you think they could find it confusing?
9       A   If I were to talk to them, I would tell them,
10  but I usually don't have that contact.  I suppose they
11  might get confused.
12      Q   Didn't think it's actually very important what
13  trust the loan is in?
14      A   Now and then.  Maybe a couple of dozen times
15  somebody has come back, and they have said, why can't you
16  change the language from May to say it's in this trust or
17  they will practically demand that the affidavits say that
18  the loan has been placed in a particular trust.  And I
19  always come back and say, I can't make that definitive of
20  a statement.
21      Q   Looking at pages 4 and 5, which is just a flow
22  chart of the process of securitization, I guess -- well,
23  strike that.
24          Can you please tell me what 4 and 5 are supposed
25  to show?

Page 147

1       A   It's supposed to show the document and money
2   flow among the various parties involved.  I did receive
3   this template, and I continued to use it, was expected to
4   use this information.
5       Q   Do you know if these pages are correct?
6       A   I suppose generally, although there won't be a
7   rating agency for GSE trusts there.  They carry the
8   sovereign credit rating of the United States.  So they are
9   not rated as we can see on the ratings page Bloomberg
10  screen.  So they could be adjusted or taken out.
11  BY MR. HOPKINS:
12      Q   I'm sorry.  What does the rating have to do with
13  these charts?
14      A   Well, for government-sponsored entities, the
15  trusts will not go to the Standard & Poor's or Moody's or
16  Dun & Bradstreet or Fitch for ratings.  The reason for
17  that is that they are backed by the federal government
18  agency securities.  Fannie and Freddie have had that
19  indirect guarantee that was realized in 2008.  And so they
20  have never needed to be rated.
21  BY MR. VAUGHN:
22      Q   What indirect guarantee of the United States are
23  you referring to?
24      A   In case of Fannie Mae or Freddie Mac collapsing,
25  the federal government would step in and make them whole.

Page 148

1       Q   And are you referring to FHA or FHFA, or what
2   are you referring to?
3       A   I'm referring to if in case they were not able
4   to pay out their obligations to investors, that the
5   federal government would step in and do that instead of
6   going into receivership since we know they went into
7   federal conservatorship under FHFA.
8       Q   Okay.  So you interpret the GSE's placement into
9   conservatorship under FHFA as the United States government
10  guaranteeing the GSE's investments?
11      A   It's been long accepted in the investment
12  community that agency securities did not carry an explicit
13  guarantee, but in case of failure, they would.  Fannie Mae
14  does not have a going concern qualification on its
15  financial statements.  It's allowed to operate.  But it is
16  under FHFA conservatorship.
17      Q   So we can mark this as an exhibit, or I'm just
18  going to -- I'll read it to you in the first instance, but
19  I will represent to you that I'm reading from the full
20  ProSupp for this particular trust on page 12, and it says,
21  "Our guarantees are not backed by the full faith and
22  credit of the United States."
23          Is that consistent or inconsistent with your
24  understanding of the guarantee that the GSEs have on their
25  investments?

Page 169

1    Where do you -- I get where you get the
2  conclusion that the loan may have been securitized. But
3  where do you get the "many times" from?
4    A   I can't support that because usually
5  securitization itself happens once -- a loan -- it says in
6  mortgages or deed of trust, the loan may be sold one or
7  more times which could arguably support -- like why would
8  they use that language at all?  Like what does it mean?  A
9  loan is sold one or more times.
10    Does that mean sequentially, but it leaves open
11  the door to fractionalization of the loan because your
12  loan may be sold one or more times.  So if a loan has been
13  securitized many times, I can't make that statement
14  because usually the securitization happens once.
15    A complete trust or perhaps tranches of a trust
16  may be resecuritized.  Freddie Mac has been known to
17  purchase whole Washington Mutual trusts, for instance, and
18  rename them.  But no, I can't make the statement anymore
19  that securitization may have been done many times.
20    But a loan sale, that could happen many times if
21  you count fractional owners.
22    Q   Okay.  I'm paraphrasing the next two lines, but
23  it says, that event would indicate -- I'll just read the
24  whole thing.  Sorry.
25    A   Okay.

Page 170

1    Q   "That event would indicate that the loan forever
2  loses its security component, i.e., the mortgage, and the
3  right to foreclose so the mortgage is forever lost."
4    Do you see that?
5    A   Yes.
6    Q   Okay.  And that's your conclusion that once a
7  loan has been securitized, it can't be foreclosed on, or
8  should I read that differently?
9    A   No.  That's what it says.
10  BY MR. HOPKINS:
11    Q   Is that -- is that accurate?
12    A   I would say that, look, state laws vary quite a
13  bit as far as what is lawfully allowed for foreclosure.
14  So I can't make that conclusion that mortgage can never be
15  foreclosed.  I have said to attorneys in deposition, they
16  have asked, so can we foreclose?  And I have said yes, you
17  can still foreclose.
18    Can they rightfully do so?
19    Well, posing as other entities, should they do
20  it?  Should they not write down the loans?  So no, these
21  are not compelling arguments as though you can say you are
22  mandated to do so, you are not mandated to show mercy.
23  But it is a prescribed thing to do.
24  BY MR. VAUGHN:
25    Q   This doesn't say that it's not right for them to

Page 171

1  do so.  It says the right to foreclose.
2    A   Yes, yes.  It oversteps.
3    Q   And this is in every one of your audits; right?
4    A   Until it was taken out.
5    Q   Okay.  Is there anything in paragraph 5 that is
6  different than the conclusions in paragraph 3 and 4, or
7  you're just restating those?
8    A   It looks like pretty much restatement, yes.
9    Q   Are you an expert in the rules and regulations
10  of the SEC?
11    A   No.
12    Q   Do you have any idea what rules and regulations
13  of the SEC apply to Fannie, Freddie, and Ginnie?
14    A   They do file SEC reports for their own stock,
15  but these are considered securities; so those rules
16  probably would not apply.  I don't know, though, as far as
17  what sort of rules there may be in terms of making
18  untruthful statements or omitting material facts for
19  publicly-traded securities.
20    Q   Okay.  Can you read the first sentence --
21    A   "Careful review" --
22    Q   -- of paragraph 6?
23    A   Yeah.
24    Q   You can read it to yourself.  I am trying to
25  give Ann a break.  And can you tell me if that sentence

Page 172

1  properly applies to this particular mortgage?
2    A   It may have been a securitized loan.
3    Q   I'm sorry.  The second sentence.  I apologize.
4    A   This doesn't seem quite as applicable.  This
5  particular verbiage would be more applicable to a bank
6  sponsored, a loan placed into a bank-sponsored trust, with
7  the parties A, B, C, and D being the -- A being sponsor --
8  I'm sorry -- the originator, the original lender, B being
9  the sponsor, C being the depositor, and D being the trust
10  in case of GSC logs.  There will not be a depositor.
11  There would be usually original lender or originator,
12  sponsor namely, Fannie Mae or Freddie Mac, and then a
13  particular securitized trust.
14    Q   Okay.  So that is not an accurate description of
15  what could happen for this loan?
16    A   No, it's not entirely accurate.
17    Q   Then the next sentence, "They also hid the legal
18  SEC filings; do you see that?
19    A   Yes.
20    Q   So you are telling Mr. Berardi here that Fannie
21  Mae hid the legal SEC filings.
22    Do you have any basis to reach that conclusion?
23    A   No.
24    Q   When was the last time you read the six
25  paragraphs in detail before today?

Page 173

```
 1      A   I would refer to them from time to time.  When a
 2   client emailed me about a particular issue, then I would
 3   explain what my opinion was for that situation.  I'd make
 4   a correction.  I haven't systematically read them in quite
 5   some time.
 6      Q   Are you comfortable that you provided Mr.
 7   Berardi with the conclusions in these six paragraphs?
 8      A   No, not after having reviewed them in this
 9   detail.
10      Q   Okay.  So that's true for any audit that you
11   would have put these in; right?
12      A   Yes.
13      Q   Can you look at the 10-K pages for Fannie, which
14   are on page -- let me ask you one more question about the
15   securitization summaries.
16           Is it fair to say that if you could go back,
17   you would take them out of those audits?
18      A   Yes.
19      Q   Any audits that they appeared in?
20      A   Yes.  I want the audits to be truthful and
21   uncover the truth.
22      Q   Can you tell me why you include excerpts from
23   Fannie's 10-Ks in the securitization audits?  That's page
24   10 to 14 of this particular audit.
25      A   I wanted to determine what sort of concerns that
```

Page 174

```
 1   Fannie Mae had regarding their own financial situation and
 2   activities in which they were involved and to relate that
 3   to individuals who had loans for which Fannie Mae owned
 4   ownership to see if there were some applicable
 5   conclusions.
 6           I did want to point out, once I looked at the
 7   condition of Fannie Mae, Freddie, the FDIC and others,
 8   Sallie Mae, what sort of financial position they had.
 9   Those for foreclosing to see if they were basically
10   following their own rules to see if there was some level
11   of hypocrisy involved.
12      Q   The pages 10 to 14 are Fannie's 2012 10-K, and
13   this is a 2017 audit?
14      A   True.
15      Q   Even if I were going to follow what you said,
16   which I'm not sure I do, why are you using the 2012 10-Ks
17   in this report?
18      A   I haven't updated the report.  I could.  But
19   yes, that's a good point.
20      Q   Would you agree with me that those four pages of
21   Fannie's 2012 10-Ks are irrelevant to a loan in
22   foreclosure in 2017?
23      A   The loan was made in 2007, and it does show the
24   course that the loan took since that time, if I were to
25   update the report with the 2017 or 2018 financial
```

Page 175

```
 1   statements once they become available.
 2      Q   I just want to stop you because I'm looking at
 3   the 10-K pages, which are 10 to 14, and I'm not at the
 4   financial statement aspects of those on the next pages.
 5      A   Okay.
 6      Q   So I don't understand why you would include the
 7   excerpts from the 10-K in a securitization audit, to begin
 8   with.  Can we just focus on those pages?
 9      A   Okay.  I thought it would be relevant to show if
10   there were problems with the books and records of Fannie
11   Mae if they have little control over their books and
12   records, then it would seem to -- we can hear argument
13   that they actually hold a loan.
14      Q   That's not anywhere on pages 10 to 14, though;
15   right?
16      A   No, not in this particular part.  I had another
17   section I've used in other reports that talks about the
18   lack of Fannie's control; so it's a lack of internal
19   control.
20      Q   Okay.  And let's -- so in this case, the way
21   these pages are presented, they don't have anything to do
22   with Mr. Berardi's loan; right?
23      A   The FHA is not allowing Fannie or Freddie to
24   make certain types of loans in terms of a principal
25   reduction that could affect Mr. Berardi.
```

Page 176

```
 1      Q   Do you know if --
 2      A   I don't know if he had actually applied.
 3   Perhaps not in this case.  Pages are not relevant.
 4      Q   And you said your intent was to include those to
 5   show that Fannie lacks control over their books and
 6   records?
 7      A   I have another section.  I have included that.
 8   For some reason did not make it into this report.
 9      Q   Why -- what does it mean for Fannie to not have
10   control over its book and records?
11      A   If there are internal control weaknesses, then
12   it may be that they don't really even know what loans are
13   on their books.  So when they make the statement, even in
14   the lookup, they say, "It appears Fannie Mae owns your
15   loan," they are not actually definitively stating that.
16   Why can't they just -- or my question, my mind is:  Why
17   wouldn't they just be able to say yes, we own your loan.
18   Why do they have to hide it?
19      Q   And it's their lack of control over their books
20   and records, you think that might mean they don't know
21   what they own?
22      A   Perhaps.
23      Q   And then the next two pages are the balance
24   sheet pages.  Page 15 is 2012 and 2011; right?
25      A   Yes.
```

Page 189

1  reviewing information I have accessed or had accessed from
2  Bloomberg and comparing it to characteristics of
3  particular loans and drawing conclusions from there.
4      Q   Reviewing Bloomberg screenshots?
5      A   Yes.
6      Q   Beyond that, would you ever claim any expertise
7  to securitization of the residential mortgage loans?
8      A   I have reviewed the various tranches or
9  splitting of the trusts into various slices and compared
10 that with prospectuses to see what sort of characteristics
11 those tranches had.  But no, I have not been involved per
12 se in structured finance.
13     Q   You'd never tell a prospective employee that you
14 are an expert in the securitization of residential
15 mortgage-backed securities; right?
16     A   I've reviewed securitization, but no, I would
17 never tell someone that I am an expert in RMBS
18 securitization.
19     Q   Let's look at Exhibit 3, which I think was your
20 affidavit for the Berardi audit.
21         I want to look at paragraph 2, which you said
22 are your qualifications which you added into the
23 affidavit; correct?
24     A   Yes.
25     Q   Okay.  When you say here, it's four lines down,

Page 190

1  that you have testified as an expert witness, do you see
2  that?
3      A   Yes.
4      Q   That means when we discussed earlier that you
5  testified in open court and that you have been deposed;
6  correct?
7      A   Yes.
8      Q   Let's set that aside and maybe come back to it.
9          MR. VAUGHN:  Off the record.
10         (A recess was taken from 2:59 p.m.
11         to 3:12 p.m.)
12 BY MR. VAUGHN:
13     Q   Back on the record.
14         Let's stick with Exhibit 2, which is the Berardi
15 audit, and you had mentioned when we started looking at it
16 that you wanted to discuss that disclosure that's on -- or
17 disclaimer that's on page 29, and I told you at the time
18 we'd get to it later.
19     A   Okay.
20     Q   If you still recall what your thought was about
21 it and you want to share it, go ahead; otherwise, I will
22 just ask you some questions about it.
23     A   I was extending my answer, as I recall your
24 question was on whether the reports were guaranteed to be
25 100 percent accurate, and so I was pointing out the

Page 191

1  disclaimer that is on the report that would lead one to
2  conclude that no guarantee has been made, to my knowledge,
3  just based on reading this.
4      Q   And is this the disclaimer that's in all of your
5  audits?
6      A   Yes.
7      Q   Did you write this or did CFLA?
8      A   CFLA.
9      Q   Let me direct your attention to the language
10 that is in the middle of the disclaimer.  It's actually
11 almost in the middle.
12         "We make no representations or warranties
13 respecting the appropriateness of our assumptions, the
14 completeness of the information considered, or the
15 accuracy of the findings."
16         Do you see that?
17     A   Yes.
18     Q   So I read that to mean that this disclaimer is
19 telling the customer, this audit, that we do not stand by
20 this audit in any way.
21         Should I read that differently?
22     A   I suppose that's true.
23     Q   Is that the message you wanted customers to get
24 when you provided these audits?
25     A   I would be hopeful they could use the reports in

Page 192

1  order to gain some sort of favorable loan modification or
2  some other outcome that they could live with, or at least
3  understanding of what happened.
4      Q   It was your hope that they could rely on an
5  audit like this to their benefit?
6      A   Yes.
7      Q   When was the last time you read that disclaimer
8  in detail?
9      A   I haven't looked at a detail for some time.
10     Q   Having read it now with us today, do you think
11 that language I just read to you belongs in this audit?
12     A   I just -- that -- I suppose not.  But that's
13 beyond my control, as long as I am providing reports to
14 CFLA.
15     Q   The template language isn't within your control?
16     A   No, not without the approval of Andrew Lehman.
17     Q   Have you ever tried to have template language
18 removed from the CFLA audit?
19     A   I have added two audits, like the case of the
20 Fannie Mae extracts of the financial statements.  I have
21 been asked to prepare new templates based on others that
22 have been provided to me.  I haven't asked for language to
23 be deleted in any systematic manner.
24     Q   Can you recall an instance in which you asked to
25 have template language deleted from one of your

Page 217

1      A   He gave me a certain timeframe.

2      Q   Uh-huh.

3      A   And said it was for the three-year period ended

4   through that date.  It was -- I think it was around July

5   of 2014 through the present at that time, which was

6   through around September of 2017.  And so I provided him

7   with the flash drive of that information which he

8   forwarded.  He contacted me again and said that he needed

9   another copy of that, but to be more current and provide

10   more extended date, which I provided to him, and that's

11   the last I saw of that particular flash drive.  I

12   certainly have the hard drive and the current flash drive.

13      Q   But he didn't -- other than the timeframe, he

14   didn't place any other restrictions or qualifications on

15   which audits to produce to him?

16      A   No, no.  As I recall, it was only for U.S.

17   audits.  It wasn't for anything international.

18      Q   And so what you did was then just give him all

19   of the audits you had prepared in that timeframe?

20      A   Right.  And some of those may have included some

21   asset-backed securities, such as cars and loans.

22      Q   And did you provide to him, or did he ask you

23   for a copy of your log in order to produce to us?

24      A   I asked him if he had wanted that, and he said

25   it wasn't necessary at this point.

Page 218

1      Q   Okay.  Does he have a copy of it, or do you

2   normally share a copy of that log with him in the regular

3   course of your business?

4      A   Not in the regular course of business.  I will

5   produce extracts of that from time to time that shows for

6   a particular client.  It just shows a pasting from Excel

7   and shows the name, address, and some MERS information.

8   BY MR. VAUGHN:

9      Q   Does that log indicate who ordered the audit, if

10   it is different than the homeowner?

11      A   No, it doesn't.

12      Q   Do you ever track that -- who actually ordered

13   the audit?

14      A   No.  I do have a field, one for the requester

15   and one for the name of the homeowner, that I sporadically

16   keep that.  I don't keep that in every case.  A company

17   orders many audits from us.  I may not provide that.

18   Typically, I want to know if the homeowner is different

19   from the borrower because then I want to give that a

20   little bit more scrutiny to find out why that particular

21   property owner is involved at all.  Like why are they --

22   are they the real party in interest, or what is really

23   going on here.

24      MR. VAUGHN:  That's all I have.

25      MR. HOPKINS:  Yes, sir.

Page 219

1      MR. VAUGHN:  Let's go off the record for a

2   minute.

3      (Off-the-record discussion held.)

4   BY MR. VAUGHN:

5      Q   Back on the record.

6      Thank you for your time today, Mr. Carrigan.

7      A   You're welcome.

8      Q   You've obviously told us a lot today, and we

9   have asked you a number of questions.

10      Is there anything else that you would like to

11   tell us, anything that we didn't ask, anything that you

12   want us to know?

13      A   I am willing to follow your direction, as far as

14   what should be done.

15      Q   Well, again, thank you very much for your time

16   today.  The Bureau reserves its right to call you back for

17   additional testimony.

18      A   I understand.

19      Q   This hearing is closed, though.

20      A   Very good.  Thank you.

21      (At 4:12 p.m., the proceedings were

22      concluded.)

23      -o0o-

24

25

Page 220

1   STATE OF CALIFORNIA     )

                            ) ss.

2   COUNTY OF LOS ANGELES   )

3

4      I, ANN BONNETTE, C.S.R. No. 6108, do hereby

5   certify:

6      That prior to being examined, the witness named in

7   the foregoing Transcript of Proceedings, MICHAEL CARRIGAN,

8   was administered an oath to testify the truth, the whole

9   truth, and nothing but the truth;

10      That said hearing was taken before me at the

11   time and place therein set forth and was taken down by me

12   in shorthand and transcribed into computer-generated text

13   under my direction and supervision; and I hereby certify

14   the foregoing transcript of my shorthand notes so taken.

15      I further certify that I am neither counsel for nor

16   related to any party to said action nor in any way

17   interested in the outcome thereof.

18      IN WITNESS WHEREOF, I have hereunto subscribed my

19   name this 16th day of January, 2019.

20

21

22      _____

23      ANN BONNETTE

24

25