BENJAMIN VAUGHN, DC Bar #999347
E-mail: Benjamin.vaughn@cfpb.gov
Phone: (202) 435-7964
GABRIEL HOPKINS, NY Bar #5242300
E-mail: Gabriel.hopkins@cfpb.gov
Phone: (202) 435-7842
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-7722

LEANNE E. HARTMANN, CA Bar #264787 - Local Counsel
E-mail: Leanne.hartmann@cfpb.gov
301 Howard St., Suite 1200
San Francisco, CA 94105
Phone: (415) 844-9787
Fax: (415) 844-9788

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, | Case No.: 2:19−cv−07722 ODW (JEMx) |
| Plaintiff, | REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION. |
| vs. | |
| Certified Forensic Loan Auditors, LLC (California); Certified Forensic Loan Auditors, LLC (Texas); Andrew Lehman; and Michael Carrigan, | |
| Defendants. | |

# **Table of Contents**

Table of Authorities .................................................................................. iii

ARGUMENT ............................................................................................. 2

   I.     All the evidence the Bureau submitted relates to CFLA. .............................. 2

   II.    Defendants do not defend their marketing practices. .................................... 3

     a.   Defendants ignore their own website. ...................................................... 3

     b.   Defendants did not market a delay tactic—they promised foreclosure defense. ........................................................................................................... 4

   III.   Defendants market and sell Audits to consumers. ....................................... 4

   IV.   Defendants cannot refute the fact that the Audits contain conclusions about the right to foreclose. ........................................................................................ 6

   V.   Defendants fail to provide any evidence specifically indicating how their Audits help homeowners in foreclosure. ............................................................ 7

   VI.   Defendants unsuccessfully attempt to undermine Carrigan's testimony. ....... 8

   VII.  Defendants provide the Court with no competent evidence ......................... 10

   VIII. The Bureau is likely to prevail on the merits of its claims. ........................ 11

   IX.   The balance of equities weighs in the Bureau's favor. ............................... 12

CONCLUSION ........................................................................................... 12

# **Table of Authorities**

**Cases**

*Davis v. Select Portfolio Servicing, Inc.*, 2017 WL 8186844 (N.D. Ga. Nov. 13, 2017).................................................................................................... 6

*Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, 2012 WL 3260418 (E.D. Cal. Aug. 8, 2012)..................................................................................................10

*FTC v. Noland*, 2020 WL 954958 (D. Ariz. Feb. 27, 2020) ....................................12

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ..................................................... 8

*FTC v. Warner Comms, Inc.*, 742 F.2d 1156 (9th Cir. 1984)..................................12

*Hylton v. J.P. Morgan Chase Bank, N.A.*, 338 F. Supp. 3d 263 (S.D.N.Y. 2018)...... 5

*Johnson v. Home State Bank*, 501 U.S. 78 (1991) ..................................................... 8

*JP Morgan Chase Bank, N.A. v. Jenkins*, 2016 WL 4417072 (N.D. Ill. Aug. 18, 2016).................................................................................................... 5

*Kirk v. Macs*, 2016 WL 5340527 (C.D. Cal. Feb. 17, 2016)..................................10

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 2008 WL 11411715 (C.D. Cal. Feb. 28, 2008)................................................................10

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013) ................................................................... 5

*Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191 (C.D. Cal. 2011) ......10

*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) ............ 5

*Stephens v. Bank of Am. Home Loans, Inc.*, 2017 WL 384315 (E.D.N.C. Jan. 25, 2017)..................................................................................................... 6

*United States v. Manamela*, 612 Fed. App'x 151 (3d Cir. 2015) .............................. 5

**Statutes**

12 C.F.R. § 1015.2...................................................................................................... 5

12 U.S.C. § 5481(15)(A)(viii)(II)............................................................................... 5

28 U.S.C. § 1746 ...........................................................................................1, 10

**Other Authorities**

Fed. R. Evid. 602 ..........................................................................................10

Defendants' Opposition to the Bureau's Motion for a Preliminary Injunction ("Opp.") Doc. 66, fails to present any persuasive arguments or facts showing why the Bureau's Motion, Doc. 64, should not be granted. The facts on which the Bureau's motion relies remain unchanged:

- Defendants make misrepresentations to consumers about the efficacy of their services and the qualifications of the individuals performing them, Mem in Supp. of PI, Dock. 64-1 ("Mem.") at 4-5;
- Consumers are misled by Defendants' representations, *id.* at 14-15;
- The Audits do not provide meritorious foreclosure defenses and no courts have relied on the Audits to stop foreclosure, *id.* at 7-10; 11-13;
- Defendants charge consumers illegal upfront fees for their services before consumers secure relief from their mortgage holder, *id.* at 3-4;
- Defendants make statements regarding the efficacy of their services without competent supporting evidence, *id.* at 21;
- Lehman is personally liable for the violations, *id.* 23-24.

The hundreds of pages of exhibits Defendants filed change none of this.

Defendants' opposition relies on misinformation and misdirection to distract from the facts. Faced with consumer complaints and adverse court decisions, Defendants erroneously accuse the Bureau of chasing the wrong company. Confronted with the wide gulf between their marketing and the actual content of their services, Defendants do not defend their illegal marketing practices but instead attempt to reinvent their business model as merely selling the "delay" of the foreclosure sales. Defendants' descriptions of purportedly "successful" uses of its Audits rely on inaccuracies and general, unsupported averments. Defendants offer no evidence to refute Carrigan's and Lehman's testimony regarding the ineffectiveness of the Audits. Instead, Defendants chose to bury the Court in irrelevant and unsupported exhibits, primarily including declarations that fail to satisfy 28 U.S.C. § 1746 and lack any indicia of first-hand knowledge or facts relevant to this case.

The Bureau is likely to prevail on the merits of its claims; accordingly, the
Court should grant the Motion for Preliminary Injunction and halt Defendants'
operations before more consumers are harmed.

**ARGUMENT**

**I.    All the evidence the Bureau submitted relates to CFLA.**

This is not a case of mistaken identity. Defendants cannot explain away the
multiple consumer complaints the Bureau cited, or the court decisions rejecting their
Audits. Instead, Defendants assert those complaints and decisions concern some
other company. Defendants are wrong.

None of the complaints the Bureau cited concerns an Illinois company, as
Defendants claim. Opp. at 2. All but three complaints cited list Defendants' Los
Angeles address, telephone number, or both. *See* Exhibit to Vaughn Decl. in Supp. of
Mem. ("Mem. Ex.") Ex. DD. The remaining three are also about Defendants. The
complaint at Ex. DD, p. 6, names Carrigan. The complaints filed at Ex. DD, pp. 59,
61 (which are duplicates) were submitted by a CFLA customer. *See* Exhibit to
Vaughn Decl. in Supp of Plaintiff's Reply ("Reply Ex.") JJ at ¶ 3.

Defendants erroneously claim that "most, if not all the cases" the Bureau cites
rejecting Defendants services "are not CFLA clients or even CFLA Audits that were
being used." Opp. at 18. Again, that is simply wrong. Defendants created every
Audit cited in those cases. *See* Reply Exs. KK-ZZ. During the Bureau's pre-suit
investigation, Defendants produced 12 of the 16 Audits to the Bureau. *Compare*
Mem. at 13-14, *with* Reply Ex. JJ at ¶4. The remaining four Audits track the style
and substance of every Audit Defendants created. Those four Audits also identify
Defendants as the creator, *see* Reply. Exs. NN, OO, TT, VV, and have other indicia
tying them to CFLA. For example, the *McGough* Audit bears Defendants' cover
page, and was used by Patricia Rodriguez, an attorney and CFLA associate. Reply
Ex. VV. The *Mori El* and *Kling* Audits also have Defendants' cover page. Reply.
Exs. OO, LL. The *Demilio* Audit was prepared prior to Carrigan's CFLA tenure by

Nkosi Gray, who Defendants later hired to pull Bloomberg screenshots at a public library. *See* Reply. Ex. NN at 59; Mem. Ex. N, at 76:18-77:1. Each page of the *Demilio* Audit used CFLA's logo, identified "Certified Forensic Loan Auditors," and contains the boilerplate that other CFLA Audits use. *E.g.*, Reply Ex. NN at 34-35, 39, 44-45. When Lehman learned that the court's decision in *Demilio* referred to the Audit as likely the product of "charlatans," he emailed CFLA associates to say he was "thinking about drafting a demand letter to the court and the judge seeking damages. . ." because he was "tired of this negative press, etc." Reply Ex. BBB.

## II.   Defendants do not defend their marketing practices.

The Bureau presented a catalog of misleading statements Defendants have made—and continue to make—on their website or in marketing materials. Mem. at 4-5. Defendants do not defend their marketing or present evidence directly challenging the facts supporting the Bureau's claims. They instead attempt to falsely claim that some of those statements are not on their website, while providing no facts showing that their Audits are actually "cutting edge" products that make it "very difficult for" banks to foreclose. *See* Mem. at 3-4. Defendants also try to lower the bar on the results they promised consumers, now claiming that the Audits are only meant to delay a foreclosure sale. Opp. at 13. The contention exposes their deception. Defendants are not selling "delay." They promise "cutting edge" products from a team of experts that allow consumers to stay in their homes and successfully sue their lenders. Defendants do not even attempt to defend their actual marketing.

### a.  Defendants ignore their own website.

Defendants challenge certain deceptive statements identified by the Bureau by claiming not to have made them; but this ignores the explicit statements on their own website. They claim that "Defendants never represented that 'Carrigan managed a team of 25 Auditors'" and they never said they are "attorney owned and operated." Opp. at 5, 8. Both statements were on their website as of May 18, 2020. *See* Reply Exs. CCC at 4; DDD at 7, 8. A May 11, 2020 marketing email claims that the Quiet

Title Packages are "drafted by competent and Qualified Attorney [sic]," Reply Ex. EEE at 11, which is consistent with Defendants' statements to consumers on sales calls, *see* Mem. Ex. J at ¶ 3. And, as of May 18, 2020, CFLA's website still states that it "is a subscriber of Bloomberg," Reply Ex. DDD at 4, 15, even though Defendants admit they are not. Dkt. 66-1 at ¶ 41.

### b. Defendants did not market a delay tactic—they promised foreclosure defense.

Rather than defend their other misrepresentations, Defendants tell the court that "[t]o prevail with the use of a securitization audit is most of the time to postponed [sic] trustee sale." Opp. at 13. Defendants also claim, without support, that "[m]any of the homeowners have a reasonable expectation and are satisfied with a delayed trustee sale." *Id.* Nowhere on Defendants' website or in marketing emails do Defendants state, implicitly or explicitly, that the "reasonable" outcome from the use of an Audit is a "delayed sale." Instead, Defendants promise the Audits will "stop foreclosure," "keep homeowners in their homes," that they are a "successful means of bringing suit against your mortgage lender," and they make "it very difficult for the bank to take possession of the home and resell it." Mem. Exs. A, II. Defendants tell consumers their services are "a Complete turn-key lawsuit to sue your lender for damages." Mem. Ex. A. The Audits themselves explicitly state foreclosure defenses. Mem. Ex. E at 13, 19, 24, 25, 27, 41-43; *see also infra* Section IV. Defendants have not, and are not, marketing a mere delay tactic—in reality, Defendants sell a defense to foreclosure they say consumers can use to save their home or negotiate loan modifications at an 80 or 90 percent success rate. *See* Mem. Ex. J at ¶ 3. And that is what consumers understood. *See* Mem. 14-15; Mem. Exs. Y-DD, GG, HH.

### III. Defendants market and sell Audits to consumers.

In another attempt at reinvention, Defendants claim they do not sell Audits directly to consumers. That is plainly not the case, but also irrelevant even if true.

Whether Defendants provide their services directly or indirectly to consumers, they are subject to the CFPA and Regulation O. Defendants are "covered persons" under the CFPA because they provide a service "to assist a consumer with . . . modifying the terms of any extension of credit, or avoiding foreclosure." 12 U.S.C. § 5481(15)(A)(viii)(II). Defendants are "mortgage assistance relief service providers" under Regulation O because they "provide[], offer[] to provide, or arrange[] for others to provide" mortgage assistance relief services. 12 C.F.R. § 1015.2. Thus the text of Regulation O makes clear that Defendants are subject to the Regulation even when they provide services to consumers indirectly. And Courts construing the term "provide" in similar contexts have concluded that "provide" includes the direct and indirect provision of services. *See, e.g.*, *United States v. Manamela*, 612 F. App'x 151, 156 (3d Cir. 2015) (interpreting the Health Insurance Portability and Accountability Act with reference to broad dictionary definitions of the word "provide" and concluding that "'[p]rovide' does not mean 'provide directly'"); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) (concluding that "provide" does not mean provide "directly" under the Telephone Consumer Protection Act); *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 202–03 (4th Cir. 2013) (both a cable service provider and the direct seller of that cable service to consumers "provided" the service to consumers).

In any event, Defendants do sell Audits directly to consumers. Carrigan estimated that half of his engagements as a purported "expert," which Lehman managed, were for pro se consumers. *See* Mem. Ex. N, at 86:3-15. Consumer complaints and declarations confirm Defendants' sales to consumers. *See* Mem. Exs. GG, HH, DD at 1, 7. 34, 37, 46, 49, 59. Lehman was on e-mail exchanges with consumers who purchased Audits. *See* Mem. Exs. Y-CC. And many pro se consumers have attempted to litigate using CFLA's Audits. *See, e.g.*, *Hylton v. J.P. Morgan Chase Bank, N.A.*, 338 F. Supp. 3d 263 (S.D.N.Y. 2018); *JP Morgan Chase*

*Bank, N.A. v. Jenkins*, 2016 WL 4417072, at *2 (N.D. Ill. Aug. 18, 2016); *Davis v. Select Portfolio Servicing, Inc.*, 2017 WL 8186844 (N.D. Ga. Nov. 13, 2017); *Stephens v. Bank of Am. Home Loans, Inc.*, 2017 WL 384315 (E.D.N.C. Jan. 25, 2017). Defendants also admit they sell directly to consumers if the consumer has "an Attorney Representing them in the matter."[1] Opp. at 5.

Defendants' products are indisputably marketed and sold to consumers. Defendants offer "a Complete turn-key lawsuit to sue ***your*** lender for damages." Mem. Ex. A at 6 (emphasis added). Defendants also implore: "Don't let the Bank Take ***Your*** Home—***You*** Have a Fighting Chance." *Id.* (emphasis added). The website has a link for "homeowner service" which links to the Audit purchase page. *Id.* at 1. CFLA sends marketing emails to consumers in foreclosure. Mem. Ex. K, ("Please Contact CFLA . . . to ascertain what you are entitled to in damages..."). According to Defendants, businesses advertising with CFLA are exposed to "tens of thousands of consumers" "each month." Reply Ex. FFF at 1.

**IV.    Defendants cannot refute that the Audits contain conclusions about the right to foreclose.**

Defendants now also claim the Audits do not contain many of the baseless legal conclusions the Bureau highlighted in its opening memorandum—for example, that because a loan is securitized, the right to foreclose has been lost. Opp at 9. The Audits themselves, and Carrigan's and Lehman's pre-complaint testimony, establish otherwise. Carrigan and Lehman both testified about the legal conclusions in the Audits, and Lehman admitted some of them are "boilerplate, conclusory bullshit." Mem. at 9. These baseless legal conclusions are in the Audit template the Bureau attached to its motion, Ex. E at 13, 19, 24, 25, 27, 41-43, and in each of the primary templates Carrigan used to produce Audits. *See* Reply Exs. GGG, GGG.1 at 2, 14,

---

[1] To the extent Defendants imply that sales to consumers who are represented by counsel provide them with a safe harbor against any of the Bureau's claims, they cite no legal authority for such a position.

19, 27, 41-43; GGG.2 at 2, 9, 13, 15, 21-22; GGG.3 at 2, 10, 11, 12, 16, 34-36; GGG.4 at 15, 21-22, 37-39; GGG.5 at 3, 11, 13-15; GGG.6 at 10, 13, 18, 30-31; GGG.7 at 7, 15-16. Those same conclusions are also in the Audits federal courts reject. *See e.g.,* Reply Exs. KK at 24; LL at 2, 13, 15, 27, 38-39, MM at 39, 46, 67-68; QQ at 59, 78-79; ZZ at 5, 25, 41-43. In an attempt to claim otherwise, Defendants appear to have created a new audit template. Without presenting any evidence that the they have used the new template, Defendants asked Carrigan to admit that it "looks like or is [] similar to audits [he] performed." Defs.' Ex. JJJJ ¶ 134; Opp at 9. Defendants use Carrigan's answer to claim that their Audits never contained some of the baseless legal conclusions that courts have repeatedly rejected. Opp at 9. Every other piece of evidence establishes otherwise.

But even if Defendants deleted every foreclosure-related conclusion from their Audits, that would not change the deceptive marketing practices at the heart of this case or the fact that Defendants charge illegal upfront fees. For example, the Audits would not transform into the "cutting edge" foreclosure defense services Defendants' falsely claim or keep consumers in their homes if the Audits provided only purported facts, and not conclusions, regarding pooling and serving agreement violations, MERS assignments and securitization. In other words, Defendants' products would still not deliver as promised and Defendants would still charge illegal upfront fees even if they used the new template audit to which they now point. *See* Mem. at 8-9.

## V.    Defendants fail to provide any evidence indicating how their Audits help homeowners in foreclosure.

Defendants do not explain how their Audits help homeowners in foreclosure. Instead, Defendants describe a handful of cases in which they claim their services were used "successfully," but their descriptions are inaccurate and unsupported by any specific evidence showing how their Audits aided a homeowner.

Defendants claim the Crayton case was a success. *See* Opp. at 14. But a foreclosure order was entered in that case in May 2019. *See* Mem. Ex. W.

Defendants claim Audits helped Peter Agbro and Lubos "Naprasek" [sic]. *See* Opp. at 14. Agbro's motion for a TRO was denied and his case against his mortgage lender was dismissed. *See* Reply Ex. HHH. A foreclosure order was entered against Naprstek. Reply Ex. MMM. Defendants say Ron Adams "was able to successfully get his mortgage discharged" with an Audit. Opp. at 12. Not so. The Adams "release" states the property is still encumbered with a mortgage. *See* Reply Ex. III. Defendants claim that "Lazar was able to effectively discharge his mortgage" in bankruptcy with an Audit. Opp. at 12-13. Lazar did not file an Audit in his bankruptcy, *see* Reply Ex. JJJ, and Defendants fail to note that "the right to foreclose on the mortgage survives or passes through the bankruptcy." *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). Defendants say the Campbell case ended in "dismissal with prejudice in exchange for a full and final release of lien on the property." Exactly the opposite is true. The case was dismissed without prejudice and the mortgage was reinstituted. *See* Mem. Ex. EE. The court did not consider sanctions against the bank, *see* Opp. at 13, but did enter sanctions against the homeowners. *See* Reply Ex. KKK at Dkt. 214 and 216.[2]

In any event, the foregoing is a transparent attempt to distract from the applicable standard. The Bureau does not have to prove that all CFLA consumers were deceived—the "existence of some satisfied consumers" is not a defense to a deception claim. *FTC v. Stefanchik*, 559 F.3d 924, 928, n. 12 (9th Cir. 2009). The issue is whether Defendants make "misrepresentations in a manner likely to mislead reasonable consumers." *Id.* That is the case here. Mem. at 4-5; 14-15; 18-21.

## VI. Defendants unsuccessfully attempt to undermine Carrigan's testimony.

Defendants offer no facts to counter Carrigan's testimony about the ineffectiveness of the Audits or his lack of experience. *See* Mem. at 6-7, 9, 18-19. So

---

[2] The exhibits Defendants cite for these cases are either mischaracterized or were not filed with Defendants' opposition.

Defendants attempt to impeach his credibility by baselessly claiming that Carrigan agreed "to testify adverse to Defendants," and that the Bureau's questioning of Carrigan was misleading. Opp. at 2-3. There is no support for these claims.

The Bureau did not misrepresent Carrigan's testimony in its opening memorandum. The Bureau's assertion that Defendants are unable to identify mortgages in securitized trusts in nearly half of their Audits is accurate. Opp. at 10. Carrigan testified that he cannot specifically locate loans held by government-sponsored entities ("GSE") in residential mortgage-backed securitization ("RMBS") trusts. *See* Mem. at 10-11. He also testified that the RMBS marketplace is "predominantly" GSE-backed securities. Mem. Ex. N, at 106:14-18. Lehman himself testified that Carrigan was unable to locate a mortgage approximately 40 percent of the time. Reply. Ex. LLL, at 168:21-172:20. Based on the Bureau's review of Defendants' Audits, about 50 percent the Audits did not specifically identify a mortgage in a trust. Mem. Ex. J. at ¶ 4.

The Bureau also did not misrepresent Carrigan's testimony regarding his qualifications. Regardless of whatever training he received from Defendants, he testified that he would "never tell someone that I am an expert in RMBS securitization." Mem. at 6. He testified that he has no legal training and no expertise in determining which state law applies during a foreclosure action. *See id.* Carrigan also testified he has no particularized experience in the residential mortgage industry, other than his experience working for CFLA. *See* Ex. AAA at 44:11-14. For most of his career, Carrigan worked in financial services and accounting roles in the private and public sector. *See* Reply. *Id.* at 30:13-32:10. Four months before joining CFLA, Carrigan performed audits for Avid Law Center. *See Id.* at 40:8-15. Carrigan left Avid when Avid's managing partner ceased producing securitization audits after he was disbarred. *See id.* at 40:18-41:10. Carrigan confirmed that prior to Avid, none of his professional experiences dealt with residential mortgages. *See id.* at 44:11-14.

1    Finally, the Bureau accurately described Carrigan's testimony that he did not

2    consider how courts view securitization Audits generally, or CFLA Audits

3    specifically. *See* Mem. at 14. Defendants only argument to the contrary is a 2017

4    study they say Carrigan performed supposedly showing that consumers who used the

5    Audits were more likely to stay on the title to the property than consumers who did

6    not use Audits. *See* Opp. at 20. Defendants provide no evidence of that study and do

7    not claim it included studying the numerous court decisions that have rejected their

8    Audits. *See id.* In any event, Carrigan testified that the "study" "cannot prove a

9    causal connection" between an Audit and a homeowner remaining in their home.

10   Reply. Ex. AAA, 207:8-13.

11   **VII.   Defendants provide the Court with no competent evidence.**

12   The court should disregard the declarations relied upon by Defendants.

13   Lehman's declaration, along with those in "Exhibit Combined," as well as Defs.'

14   Exs. AAA, AAAA, AAAAAA, BBB, BBBB, CCCC, MMMM, and RRRR are not

15   "substantially" in the form required by 28 U.S.C. § 1746(2). They were not executed

16   under "penalty of perjury." Most also appear to be unsigned. The declarations in

17   "Exhibit Combined" at pages 20-22, 32-108, 138-139, and 142-219 appear to be

18   compilation documents in which an electronic signature page was attached to a form

19   declaration. As such there is "no proof that the declarant saw the document or

20   approved of its contents." *Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, 2012 WL

21   3260418, at *7 (E.D. Cal. Aug. 8, 2012). "[C]ompliance with the requirements of 28

22   U.S.C. § 1746 is mandatory." *Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp.

23   2d 1191, 1195 (C.D. Cal. 2011). Accordingly, the court should disregard these

24   declarations. *See Kirk v. Macs*, 2016 WL 5340527, at *5 (C.D. Cal. Feb. 17, 2016).

25   Beyond the mandatory requirements of § 1746, the purported declarations

26   cited above also lack other indicia of credibility. The declarations at pages 1-5, 20-

27   23, 32-108, 138-139, and 140-14-219 of "Exhibit Combined" are conclusory and

28   devoid of facts indicating relevant first-hand knowledge. They do not even identify a

connection to CFLA. *See* Fed. R. Evid. 602 (witness "may not testify to a matter
unless . . . the witness has personal knowledge of the matter"); *see also La
Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,* 2008 WL
11411715, at \*4 (C.D. Cal. Feb. 28, 2008) (disregarding declarations with "factually
unsupported, vague, conclusory, and speculative statement[s]").

Even if the court considers these declarations, they have no probative value.
Each declaration states: "The ability to trace my mortgage to a Residential Mortgage
Back Securities Trust is a service that benefits consumers greatly and the loss of this
resource will cause great hardship on myself and other consumers." Whether true or
not, the statement does not change the fact that Defendants engage in deceptive
marketing and charge illegal upfront fees. More to the point, the Bureau is not
seeking a preliminary injunction simply because Defendants' services are useless or
because they say they can "trace" a mortgage to an RMBS trust (which they cannot
do half the time). The Bureau seeks a preliminary injunction because Defendants
grossly misrepresent the efficacy of their services and charge illegal upfront fees.

Other unsworn declarations, to the extent they have any value, indicate that
Defendants' customers believed Defendants' marketing misrepresentations about
"cutting edge" foreclosure defenses. For example, one declarant said the Audit
"established that the servicer has dubious rights to foreclose. . ." *Id.* at 14-15. Others
express similar sentiments. *See e.g.*, *id.* at 6-7; 16-17; 24-31; 220-21; Defs.' Exs.
AAAA, AAAAAA. These declarants may still believe Defendants' representations
about the Audits' efficacy, but there still is no evidence that any consumer
successfully used Defendants' Audits to defeat foreclosure.

## VIII. The Bureau is likely to prevail on the merits of its claims.

The Bureau remains likely to succeed on the merits of its claims:

- Defendants do not dispute that they charge consumers before the
  consumers obtained relief from their mortgage holder or servicer in
  violation of Regulation O. *See* Mem. at 17.

- Defendants present no evidence to explain why their representations to consumers are not deceptive—and their new claim that reasonable customers should only have expected a "delayed trustee sale date," only underscores their deception. *See* Mem. at 18-23.

- Defendants produce no evidence that they relied on "competent and reliable evidence" as required by Regulation O, when making representations about the efficacy of their services.

- Defendants present no evidence that Lehman is not individually liable under the CFPA or Regulation O. *See* Mem. at 23.

To the extent the opposition can be read to raise a defense based on a claim that the Bureau is unconstitutionally structured, the Bureau incorporates by reference its arguments in Opposition to Defendants' Motion to Dismiss. *See* Dkt. 47 at 13-16.

## IX. The balance of equities weighs in the Bureau's favor.

The balance of equities tips heavily in the Bureau's favor. Defendants contend that certain declarations suggest otherwise. Opp. 24-25. For the reasons already discussed, there is no basis to consider such declarations, and even if they are considered, they offer no evidence relevant to this case. *See supra* Section VII. Defendants next contend, without evidence, that a preliminary injunction will put them out of business. Even if true, the balance of equities remains in the Bureau's favor. "Although private equities may be considered, public equities receive far greater weight." *FTC v. Noland*, 2020 WL 954958, at *14 (D. Ariz. Feb. 27, 2020) (citing *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)). And here, the public equities, *see* Mem. at 24-25, combined with the likelihood of success on the merits, "outweigh Defendants' interest in continuing their business as-is." *Noland*, 2020 WL 954958, at *14.

## CONCLUSION

For the foregoing reasons, the Court should grant the Bureau's motion for preliminary injunction as set forth in the Proposed Order filed with its motion.

Dated: May 18, 2020                    Respectfully submitted,

                                       /s/ Benjamin Vaughn
                                       Leanne E. Hartmann
                                       Benjamin Vaughn (pro hac vice)
                                       Gabriel Hopkins (pro hac vice)

                                       Consumer Financial Protection Bureau
                                       1700 G Street, NW
                                       Washington, DC 20552

                                       *Attorneys for Plaintiff*
                                       *Bureau of Consumer Financial Protection*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Benjamin Vaughn, hereby certify that the foregoing Reply Memorandum in Support of the Bureau's Notice of Motion for Preliminary Injunction was electronically on the parties via the Court's electronic filing system.

*/s/* Benjamin Vaughn

Benjamin Vaughn (pro hac vice)